395 F.2d 145
 NORTH SHORE SEWER AND WATER, INC., and Transamerica
Insurance Company, Plaintiffs-Appellees,
v.
CORBETTA CONSTRUCTION CO., Inc., Defendant and Counter
Claimant-Appellee, and United States Steel
Corporation, Defendant and Counter
Defendant-Appellant.
 No. 15993.
 United States Court of Appeals Seventh Circuit.
 March 26, 1968, Rehearing Denied June 12, 1968.
 
 Harlan L. Hackbert, Jeremiah Marsh, Chicago, Ill., for appellant.
 C. Lysle Smith, Douglas C. Moir, John Alden Powers, Richard L. Mandel, Ira A. Kipnis, John L. Steffens, Roger D. Doten, Edward P. McNeela, Chicago, Ill., for appellees.
 Before SCHNACKENBERG, CASTLE, and SWYGERT, Circuit Judges.
 SWYGERT, Circuit Judge.
 
 
 1
 This action concerns the construction of an industrial sewer at the United States Steel Corporation steel plant in Gary, Indiana. Corbetta Construction Co., Inc., a New York Corporation with its principal offices in New York City, was the general contractor for the project. The subcontractor was North Shore Sewer and Water, Inc., an Illinois corporation with its principal place of business in Lake Forest, Illinois. Transamerica Insurance Company (formerly Pacific National Insurance Company), in the business of providing performance bonds to contractors, paid certain sums on behalf of North Shore to enable that company to complete its contract. Thereafter North Shore assigned its claim asserted in this action to Transamerica as security for such payments.
 
 I. FACTS
 
 2
 On April 25, 1962 Corbetta and U.S. Steel executed a contract whereby Corbetta was to build an industrial relief sewer at the Gary Steel Works for a lump sum of $445,000. Thereafter on May 25, 1962, Corbetta and North Shore entered into a subcontract whereby North Shore agreed to perform the bulk of the sewer installation for the sum of $212,000.[1] North Shore completed the sewer about December 1, 1962, and U.S. Steel finally accepted the project on March 27, 1963.
 
 
 3
 The sewer constructed by North Shore was seventy-eight inches in diameter, 1600 feet in length, and placed approximately twenty feet below ground. Interspersed along the route were seven manholes. Each manhole was dug to the depth of the sewer and was approximately twenty feet square. The new sewer was a relief sewer, designed to divert water, discharged from the steel mill, from two industrial sewers lying generally parallel with and on either side of the one installed by North Shore. All the sewers, including the new one, emptied into the Grand Calumet River at a point parallel to Lake Michigan. The United States Steel's Gary Works is located between the lake and the river. The following diagram shows the plan and the course of the sewer installation.
 
 
 4
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 5
 The manholes are designated by letters A, B, B', C, D, E, and J. The letter H designates a headwall built in the river at that point. The new sewer ran generally south to the river but at manhole E jogged east at an angle to hook up with an existing five-foot sewer at manhole J. Water was diverted at manhole J into the new sewer.
 
 
 6
 The sewer was installed in open-cut excavations between points H and A and between points D and J. Tunneling was performed generally between points A and D. The construction difficulties which constitute the basis of this controversy were encountered in the area between points B and C.
 
 
 7
 At a meeting on December 6, 1961, U.S. Steel distributed a soil investigation report prepared by Dames & Moore, consultants in applied earth sciences. Each prospective bidder, including Corbetta and North Shore, received a copy to be used in preparing their bids. According to the report, the water level in the sewer area was between eight and ten feet above the Chicago datum. Consequently, the sewer's location necessitated dewatering to lower the natural ground water level to a point below the bottom of the sewer, thus enabling the installation to be accomplished in dry ground.
 
 
 8
 The report stated that certain areas along the sewer were inaccessible to drilling equipment, that the subsurface conditions in these areas were not explored, and that the overall condition of the soil, therefore, had to be interpolated between the test borings. Subsurface soil, fill, and water conditions along the balance (85 per cent) of the proposed route were reported. In this respect, a diverted river bed of clay stratum covered by sand fill was charted from manhole A to a point north of manhole B. Included in the report was a recitation of its purposes:
 
 
 9
 1. To determine the subsurface fill, soil, and ground water conditions at the site to the depths which will be influenced by the proposed construction. 3. To provide recommendations relating to special precautions or construction techniques necessitated by the subsurface conditions.
 
 
 10
 Finally, the report outlined its dewatering recommendations, 'It is considered that well points or a similar dewatering system will be required to lower the water table to the desired level.' No special precautions or other construction techniques were noted. The report was incorporated in the minutes of the December 6, 1961 meeting, and those minutes were incorporated in the contract thereafter entered into by U.S. Steel and Corbetta.
 
 
 11
 The installation procedure followed by North Shore in the tunneled area, in accordance with the plans and specifications, was to dig a manhole and then start tunneling in two directions. The dewatering equipment, consisting of well points installed below the water level, pumped the water up and into pipes which eventually discharged the water into U.S. Steel's existing parallel sewers to the east and west.
 
 
 12
 At the start of the construction, North Shore employed a well point dewatering system to dry out a portion of the river preparatory to the installation of the headwall. North Shore then dug an open cut trench from the headwall to manhole A. Next, manhole B was dug so tunneling could start back toward manhole A and forward toward manhole B'. At this poini, hot and excessive water was this point, hot and excessive water was the work.
 
 
 13
 U.S. Steel after being informed of this problem, advised Corbetta which in turn advised North Shore that the hot and excessive water was caused by perched water above the old river bed. U.S. Steel told North Shore to drain away the perched water. In order to do so, North Shore installed additional well points below the old river bed and punched special weep holes through the clay strata. Despite these procedures, hot and excessive water continued to flow into the excavations required for the tunneling operations.
 
 
 14
 North Shore was then told by U.S. Steel that it had probably hit an underground spring. But no spring was found. A special chemical was then pumped into the ground to solidify the soil; however, this procedure failed to solve the problem. U.S. Steel next informed the contractors that the hot water problem was being caused by ground water warmed when passing underneath regeneration chambers at one of the steel company's open hearths.
 
 
 15
 Finally, to locate the source of the hot and excessive water, dye tests were conducted in the U.S. Steel five-foot sewer located east of the job site. A green dye was placed in the sewer. Shortly thereafter, green water was discharged from the well points installed along the job site of the new sewer. After observing the dye tests, U.S. Steel's engineer on the job recorded in his log that there was a 'serious leak in the five-foot sewer.' Moreover, further chemical tests conducted on water samples established that the water discharged by the well point system was 'peculiar for normal ground water' and 'might have come from another source.'
 
 
 16
 The greatest hot water problem was encountered between manholes B, B' and C. This area was near the point where a three-foot sewer emptied into the five-foot sewer. The three-foot sewer carried water used to cool steel furnace doors that had temperatures in excess of 2800 degree(s) F. The five-foot sewer was approximately fifty years old. During that period no repairs had been made on it. With the exception of dredging for sediment, it had never been maintained.
 
 
 17
 Although North Shore had estimated that the tunneling should take approximately three months to complete, it actually required seven months. The work was hampered by cave-ins and voids due to the hot water. North Shore was obliged to install well points and other dewatering equipment in excess of the equipment which would have been necessary to remove ordinary ground water. Moreover, a specially designed shield was made by North Shore to aid the tunneling.
 
 
 18
 After the dye tests in October 1962, U.S. Steel permitted North Shore to make additional open cuts in certain areas and install special drains from the open cuts to the water-logged areas. North Shore had attempted to use this technique previously but had discontinued it on orders from U.S. Steel. By the use of this technique and the special shield, the sewer was installed.
 
 
 19
 On the basis of the foregoing facts, North Shore and Transamerica sued Corbetta and U.S. Steel, basing jurisdiction on diversity of citizenship. There were six counts in the complaint. Count I sought recovery against Corbetta pursuant to the provision in the subcontract for payment of 'extras.' Count II sought recovery against Corbetta for the reasonable value of the work caused by a breach of the subcontract. Counts III, IV, V, and VI sought recovery against U.S. Steel: Count III for 'extra work' as provided for in the main contract on a third-party-beneficiary theory, Count IV for negligently interfering with the work undertaken by North Shore, Count V for falsely representing to the contractors the subsurface condition and the source of the unexpected and excessive water encountered, and Count VI for the reasonable value of the additional work required by North Shore to complete the sewer.
 
 
 20
 Corbetta cross-claimed against U.S. Steel. Corbetta alleged that it had tendered to U.S. Steel its defense against North Shore's claims and that U.S. Steel had declined such tender. The crossclaim contained a demand that if North Shore recovered a judgment against Corbetta, then Corbetta be granted a recovery against U.S. Steel. This recovery sought the amount of any judgment against Corbetta, the reasonable value of the supervision and office expense of Corbetta, and the expenses of Corbetta in defending against North Shore's claims, including attorneys' fees.
 
 
 21
 At the conclusion of the trial, the district judge announced that he found for the plaintiff and against U.S. Steel but that he believed the evidence was insufficient 'to warrant a finding against Corbetta Construction.' The judge directed counsel for plaintiff and Corbetta to prepare findings of fact and conclusions of law, 'in accordance with their theory of what the evidence has shown, in accordance with my (the judge's) suggestions.' These he adopted in toto. A judgment was accordingly entered for plaintiff against U.S. Steel in the sum of $269,593.71 plus interest in the sum of $55,266.71, for a total of $324,860.42. In addition, judgment was entered for Corbetta in the sum of $46,412.85,[2] plus interest in the sum of $9,514.16 and attorneys' fees and expenses in the sum of $26,007.50, for a total of $81,934.96.
 
 
 22
 The basic factual question before the trial court for determination was the source of the hot water encountered by North Shore in its operations. U.S. Steel argues that the only likely source, as shown by the evidence, was underground water which was heated by operations in the steel mill and which then flowed westward toward the new sewer, following the now buried bed of the Grand Calumet River.[3] We have reviewed the evidence and conclude that the district court was amply justified in rejecting U.S. Steel's theory. In addition we believe that the preponderance of the evidence supports the finding that the five-foot sewer leaked the hot water into the excavations dug for the new sewer, creating the perplexing dewatering problems.
 
 II. LIABILITY
 
 23
 The district court found U.S. Steel guilty of negligence which proximately caused North Shore's unforeseen and extraordinary construction difficulties. In addition, the court found that U.S. Steel failed to both properly investigate the cause of the hot water interfering with the work and promptly correct the condition when the old sewers were proved to be the source of the leak.[4] We believe the most tenable theory for sustaining the court's judgment of liability is that U.S. Steel breached an implied contractual duty not to impede or hinder North Shore in the performance of its obligations under the contract.
 
 
 24
 Generally, if facts existing at the time a building contract is made or occurring thereafter render the performance of the contract more expensive or difficult than anticipated, the risk falls on the contractor. He has the duty to perform his contract according to its terms, regardless of the added difficulties or cost. Day v. United States, 245 U.S. 159, 38 S.Ct. 57, 62 L.Ed. 219 (1917); Restatement of Contract 467 (1932); 6 A. Corbin, Contracts 1333 (1962).
 
 
 25
 There is, however, an exception to the general rule which has application to this case. The events which created unexpected performance difficulties referred to in the general rule relate to natural conditions or phenomena over which neither of the parties has any control. Under the exception, there is an artificial condition or phenomenon which one of the parties is responsible for creating or perpetuating. Thus, where a landowner has either actively created or passively permitted to continue a condition over which he has control which renders performance of the contract more difficult or expensive, he has breached an implied contractual duty for which he must respond in damages.
 
 
 26
 This implied duty has been recognized in both the legal literature and the case law. In his treatise, Professor Corbin has stated the duty in the following terms,
 
 
 27
 In any kind of contract, if the right of one party to compensation is conditional upon the rendition of some service or other performance by him or on his behalf, it is nearly always a breach of contract for the other party to act so as to prevent or to hinder and delay or to make more expensive the performance of the conditions. 3 A. Corbin, Contracts 571, at 349 (1960).
 
 
 28
 A New York case, Ryder Bldg. Co. v. City of Albany, 187 App.Div. 868, 176 N.Y.S. 456, 458 (1919), applied the duty in upholding an award of compensation for additional work. There the court said,
 
 
 29
 In every express contract for the erection of a building or for the performance of other constructive work, there is an implied term that the owner, or other person for whom the work is contracted to be done, will not obstruct, hinder, or delay the contractor, but, on the contrary, will in all ways facilitate the performance of the work to be done by him.
 
 
 30
 Shea v. City of Los Angeles, 6 Cal.App.2d 537, 45 P.2d 221 (1935), a more recent case particularly in point, also implied such a duty. There the plans for a storm drain showed a sewer parallel to a portion of the proposed installation. While excavating this portion, leakage, due to defects in the sewer, flooded the excavated area. The court held:
 
 
 31
 When the contract in question was executed by defendant and plaintiffs, the law imposed on defendant city a new obligation, to wit, that of maintaining its sewers and filling in its streets in such a manner that it would not impede plaintiffs in carrying out the task of constructing the storm drain. If that duty was violated, the plaintiffs were entitled to damages to compensate them for the detriment thus caused. Shea v. City of Los Angeles, 45 P.2d at 222.
 
 
 32
 In the present case there is no suggestion that either Corbetta or North Shore had knowledge that the old sewer would leak. U.S. Steel contends, however, that the Dames & Moore report showed the location of the existing sewers and that North Shore's construction superintendent knew that they had been installed in 1906 when the plant was built. Yet, the argument continues, neither Corbetta nor North Shore made any inquiry as to either the condition of the sewers or whether U.S. Steel inspected or maintained them. In Horgan v. City of New York, 160 N.Y. 516, 55 N.E. 204 (1899), a contract contemplated the draining of a lake in order to undertake new construction. The city was held liable for additional work entailed by its failure to have in working order an outlet pipe invisible before the draining started. There the court said:
 
 
 33
 It was, of course, impossible, when the plaintiff went upon the ground, to examine the proposed work to see more than the outlet gate, and the size thereof. Whether the sewer lying beyond was in a condition to carry off the water was something that he could not ascertain by a mere inspection of the premises. A fair construction of the contract on this point authorized the contractor to assume that the pond could be drained of water in a general sense. Horgan v. City of New York, 55 N.E. at 205.
 
 
 34
 We are of the opinion in the instant case that, on the basis of Horgan, North Shore had no obligation either to determine whether U.S. Steel maintained its sewers in good repair or to anticipate that the old sewers would leak after construction of the new sewer started.
 
 
 35
 U.S. Steel also argues that actual or constructive knowledge that the existing sewer was damaged or would leak is essential to impose liability, citing DiMenna & Sons, Inc. v. City of New York, 301 N.Y. 118, 92 N.E.2d 918 (1950) and Pilkington v. City of New York, 211 App. Div. 558, 207 N.Y.S. 118 (1924), and that such evidence is wholly lacking here. Although it is true that U.S. Steel may not have had actual knowledge at the time the contract was made that its sewers were leaking, it did have knowledge that the old sewers had never been inspected or maintained. Moreover, when it did obtain actual knowledge of leakage from its sewers during the course of construction, it took no steps to check or repair them. In fact, U.S. Steel encouraged North Shore to continue with the work after the hot water had been encountered, fully cognizant that to do so would entail additional time and expenditure.
 
 III. DAMAGES
 
 36
 (a) North Shore.
 
 
 37
 The district court determined that North Shore was entitled to recover $269,593.71 against U.S. Steel, together with interest from April 12, 1963 (when North Shore's claim was submitted) to the date of judgment 'pursuant to Burns Indiana Statutes Annotated, Section 19-12-101 (1964).' We believe that the court erred both in adopting North Shore's method of determining damages and in awarding interest.
 
 
 38
 In computing its claim for additional work, North Shore improperly used the unit rates provided in the prime contract. Instead, the proper measure of damages should be the actual additional expense, including overhead, incurred by North Shore by reason of the leakage from U.S. Steel's sewers.
 
 
 39
 North Shore argues that the parties stipulated that if North Shore was entitled to recover damages, the prime contract unit prices would apply. In fact the district court so found. We do not read the stipulation in this manner. The stipulation was merely to the effect that the unit rates set forth in the purchase order from which North Shore calculated its claim were identical with those set forth in the prime contract.
 
 
 40
 All delays and additional labor and equipment costs were attributed by North Shore, in computing its claim, to the dewatering problems caused by U.S. Steel's failure to prevent the hot water from its sewer from flooding the excavations. However, the record reveals that some delays were caused by equipment failure, insufficient manpower, and surveyor's mistakes. U.S. Steel should not have been charged for additional costs occasioned by factors such as these.[5]
 
 
 41
 The district court allowed interest pursuant to the Indiana statute which in relevant part reads:
 
 
 42
 The interest on loans or forbearance of money, goods, or things in action, shall be as follows: (a) When the parties do not agree on the rate, interest shall be at the rate of six dollars ($6.00) per year per one hundred dollars ($100); (c) By agreement in writing duly signed by it, and not otherwise, any corporation may lawfully agree to pay any rate of interest whatever. Burns' Ind.Stat., 1964 Repl., 19-12-101.
 
 
 43
 North Shore's claim was not based on a loan or a forbearance of 'money, goods, or things in action' or evidenced by 'an agreement in writing.' Faced with this realization, North Shore now argues that interest was not awarded pursuant to the Indiana statute, despite the district court's express finding to that effect. North Shore contends that an award of interest is not governed solely by statute and that under Indiana law interest may be awarded even though there is a reasonable dispute both as to liability and the amount of damages, citing New York, C. & St. L. Ry. Co. v. Roper, 176 Ind. 497, 96 N.E. 468, 36 L.R.A.N.S., 952 (1911) and New York Central R.R. Co. v. Churchill, Ind.App., 218 N.E.2d 372 (1966). These cases are inapposite. In Roper interest was allowed on the value of a house destroyed by a fire caused by the defendant railroad's negligence. The court pointed out that in such a case, 'the value (of the destroyed property) can be ascertained by fixed rules,' but added that in cases where there is no 'standard of market or other value by which to measure the damages,' interest is not allowable. In Churchill interest was allowed on the loss of the use of a tractor-trailer unit destroyed by reason of the negligence of the defendant railroad. The court held that loss of use was determinable by the fair rental value which was 'easily ascertainable with a degree of certainty.'
 
 
 44
 In the case at bar, North Shore's damages were neither fixed or definite nor ascertainable by a fixed standard. As in the case of Mansfield v. New York Cent. & H.R.R. Co., 114 N.Y. 331, 21 N.E. 735, 4 L.R.A. 566 (1889), the claim here was 'purely in damages * * * (was) unliquidated and contested, and * * * so uncertain that a demand cannot set the interest running.' Mansfield was an action for breach of a building contract in which damages were awarded the contractor because of delays occasioned by the owner. Interest on the amount recovered was disallowed by the court. Accord, John Weber & Co. v. Hearn, 49 App.Div. 213, 63 N.Y.S. 41 (1900).
 
 
 45
 (b) Corbetta
 
 
 46
 Contrary to the ruling of the district court, we believe that Corbetta is entitled to recover only those additional expenses which it directly incurred as a result of the leakage of hot water from U.S. Steel's sewer, together with the sum of $22,413.16, representing the unpaid balance on its contract which was withheld by U.S. Steel. On this latter sum, we think interest is allowable from the date such sum became due inasmuch as the unpaid balance was liquidated in amount.
 
 
 47
 Corbetta is not entitled to any profit on North Shore's additional work here in controversy or to attorneys' fees and litigation expense, all of which were allowed by the district court as part of Corbetta's damages under its cross-claim. With respect to the attorneys' fees and litigation expenses, Corbetta did not, as it contends, defend North Shore's claim against U.S. Steel. North Shore made no effort to prove its claim against Corbetta. Instead, Corbetta joined with North Shore in the prosecution of the latter's claim and adopted North Shore's evidence. In addition, Corbetta pressed its own claim against U.S. Steel to recover the additional cost of 'supervision' and 'office expense,' plus a five per cent profit on the full amount of North Shore's claim. Because the litigation expenses of Corbetta were incurred in pressing its claim against U.S. Steel, not in defending itself against North Shore, there can be no justification for Corbetta's recovery of attorneys' fees and litigation expense.
 
 
 48
 The judgment is reversed and the cause is remanded for a redetermination of damages consistent with the views expressed in this opinion.
 
 
 
 [1]
 North Shore, however, started the work on April 23, 1962
 
 
 [2]
 The district court itemized this amount as follows:
 (a) Corbetta's expense incurred in the performance of extra work,.$10,450.00;
 (b) A 'reasonable profit' to Corbetta for the extra work, $13,479.69;
 (c) The unpaid balance of the unadjusted contract price, $22,483.16.
 
 
 [3]
 Prior to the building of Gary, the Grand Calumet rose just east of the property later acquired by U.S. Steel and flowed west and southwest roughly parallel to the south end of Lake Michigan. U.S. Steel diverted the river into an artificial channel near the south line of its property and filled in the land above the old river bed
 
 
 [4]
 The district court advanced other and inconsistent reasons for fixing liability as it did
 (a) Misrepresentation. The district court found that the Dames & Moore report described the area of the proposed work as having 'static ground water,' that no unusual conditions should be anticipated, and that no special construction techniques would be required. The court also found that North Shore relied upon these assertions which 'proved to be erroneous.' The record is devoid, however, of any evidence that either those responsible for the Dames & Moore report or U.S. Steel deliberately misrepresented or concealed any facts which were known at the time the report was issued. Moreover, there was no implied warranty that only normal ground water would be encountered or that no special construction techniques would be required. For that reson, the court erred in basing liability on misrepresentations.
 (b) Extra Work. The district court found that North Shore was required to furnish extra work and that the 'extra work' provisions of the main contract were applicable to North Shore as third-party beneficiary. The contract provided that if there was a significant change in the scope of the work, the work was not to proceed 'until there is an agreement in the price change,' and that all 'extras' had to be negotiated as to price before they were undertaken. The work involved in this controversy was not 'extras' falling outside the scope of the contract but instead was 'additional' work, occasioned by unexpected conditions, which was required to complete the project as designated by the original plans and specifications. As we read North Shore's brief in this appeal, it has abandoned the theory, adopted by the district court, that liability should be based on the provisions of the contract in respect to 'extra work.'
 
 
 [5]
 On remand the district court should resolve the question whether U.S. Steel was properly credited, if in fact any credit was due, for additional payments made for 'delays caused by hard excavation.'