S. LEO HARMONAY, INC. d/b/a
Harmonay Company, Plaintiff,

v.

BINKS MANUFACTURING
COMPANY, Defendant.

No. 82 Civ. 6868 (IBC).

United States District Court,
S.D. New York.

Oct. 26, 1984.

**1018**

---

Ross & Cohen, New York City, for plaintiff; Allen Ross, James F. Oliviero, Brenda Gilmer, New York City, of counsel.

Bleakley Schmidt, P.C., White Plains, N.Y., Kasimer & Ittig, Washington, D.C., for defendant; Gerard W. Ittig, Washington, D.C., and Frederick Martin, White Plains, N.Y., of counsel.

## OPINION

IRVING BEN COOPER, District Judge.

This is an action by S. Leo Harmonay, d/b/a Harmonay Company (Harmonay), a New York corporation, against Binks Manufacturing Company (Binks), a Delaware corporation with its principal place of business in Illinois, for breach of a construction contract.*,[1] Plaintiff was the mechanical piping subcontractor to defendant, one of a number of general contractors on the expansion of a General Motors (GM) automobile assembly plant in Tarrytown, New York. Defendant's project involved the construction of two additions to the plant, known as the Body Phosphate Facility and the Body Elpo Dip System; it subcontracted out the mechanical piping work to plaintiff at a cost of approximately two million dollars.

---

\* We regret the delay in filing this opinion. Extremely serious and protracted illness suffered by each member of our staff since the post trial papers were filed, together with other good and sufficient reasons, account therefor.

**1.** Prior to trial, defendant's counterclaim against plaintiff was withdrawn by stipulation.

Plaintiff claims that defendant breached the contract by causing certain project delays which resulted in an increased cost of materials, labor inefficiencies and excess supervision during an acceleration period; that it is entitled to a markup for overhead and profit for overtime work performed; and that it should be compensated for its field office costs incurred after the original job completion date.

Jurisdiction is vested in this court under 28 U.S.C. § 1332. The amount in controversy exceeds $10,000 exclusive of interest and costs.

*Facts*

In late 1980, defendant contracted with GM to construct the Body Elpo Dip System and Body Phosphate Facility, a new painting system for the GM automobile plant. The GM project site on which the construction was to occur consisted of two buildings, body and chassis plants, parallel to each other. The extension of the south end of the body plant in order to construct the new facilities was referred to as the "Elpo Building addition." (Tr. 8)[2]

At trial, Edward Klapp, the vice-president of Harmonay, first described the workings of a phosphate machine as follows: "[The new partially assembled car] comes on an overhead conveyor, [and] goes through eight stages of washing and cleaning ... inside of a totally enclosed housing where there are spray headers [and] drain pans to keep the water circulating over the [automobile] body." (Tr. 15) After the car proceeds through the phosphate system, it is a "nice shiny piece of metal ... and clean."

The Body Elpo Dip System then paints the cleaned automobile body. As explained by Klapp: "[After the car drip dries on the third floor] [i]t is ... returned by means of conveyor back down to the second floor, at

---

**2.** Throughout this opinion, the letters "Tr" followed by a number in parentheses indicates a particular page number in the trial transcript. The same applies to an "Ex." which refers to a specific exhibit.

which point it is put through the Elpo system. It starts by having the body totally immersed into paint substance which is basically a primer ... [i]t's an electroly [sic] charged painting system." (Tr. 15) Following the phosphate and Body Elpo treatments, the auto is conveyed back to the third floor of the body plant where it moves through a series of drying ovens prior to the application of other accessories onto the automobile.

The scope of defendant's work on this project was set forth in the GM "Specifications for Body Phosphating Facilities— GMAD Elpo Building—S–358 and S–359". (Ex. 10) Specification S–358 covered the phosphate facilities and S–359 encompassed the Body Elpo facilities. The GM specifications included instructions to bidders, proposal forms, a time schedule, a scope of work section, technical specifications, and "GM Contract General Conditions". The general conditions set forth, *inter alia*, basic provisions concerning time extensions, extra work, change orders, and overtime work.[3]

Harmonay's first contact with Binks was a phone call in October, 1980, from Fred Steinhebel, a representative of Binks, who told Klapp that Binks was bidding on a painting system for new cars and requested a bid from Harmonay on the mechanical piping work. (Tr. 13) As was customary bidding procedure among contractors, plaintiff used the GM technical specifications, including bid drawings or schemactics, in order to prepare its bid for defendant. Klapp, whose duties were to oversee the daily office and field operations, testified that this bid was compiled by pricing materials required by types and sizes, adding labor values based on plaintiff's "experience over the years working at General Motors" and finally adding overhead and profit to arrive at the bid price package. (Tr. 17)

Plaintiff was awarded the contract, and by signed purchase order dated December 9, 1980 [4] agreed to perform the general mechanical piping work for a total compensation of approximately two million dollars. (Tr. 8) The October 31, 1980 quotation confirmed plaintiff's verbal quotation to defendant to perform work "in accordance with specifications titled 'Specifications for Body Phosphating Facilities' and 'Body Elpo Dip System'" (*i.e.*, "GM Specifications") and certain enumerated drawings. A second written purchase order, dated January 7, 1981 (Ex. 9) modified the original subcontract only to the extent of eliminating and adding various items of work for the prices therein enumerated.

It is well known in the construction business that the schemactics set forth in the owner's specifications are approximations used to enable potential subcontractors to make bids; that they often lack, for instance, exact distances. (Tr. 18–23) Accordingly, a subcontractor who is awarded a contract receives from the contractor precise drawings (contract layout drawings) before the construction work begins so that he may order the proper types and amounts of materials. (Tr. 31) To that end, Klapp, prior to bidding, discussed with Steinhebel the defendant's responsibility to provide contract layout drawings so that Harmonay could "make take-offs and order materials that would be needed to start the installation of the project." The drawings were to be prepared by another Binks subcontractor, Industrial Finish Engineering, Inc. (IFE), whose principal was Edwin Schacterle, and were to include, *inter alia*, plan views, elevations, equipment locations, tie-ins between the equipment and piping, and all pipe sizes. In addition, defendant retained IFE and Schacterle to render engineering services for the project as set forth by a purchase order dated December 9, 1980.

---

**3.** These relevant provisions will be set forth in detail, *infra.*

**4.** Plaintiff's January 2, 1981 cover letter to defendant enclosing the signed purchase order

(Ex. 9) notes "no payment terms were outlined in your order" and records the parties' agreement on the terms of payment.

Pursuant to the GM Specification "Time Schedule," bids were due on October 27, 1980; the bid award target date was November 3, 1980; and "Major Drawings Submittal (Layouts, Sections, Schemactics and Equipment Data) Complete" were to be submitted from "12/15/80 to 1/15/81." Klapp testified that Steinhebel referred to the "importance [of] hav[ing] the drawings as quickly as possible, hopefully by the first of January, so that [Harmonay] could make our take-offs [drawings] and order the material that would be needed to start the installation of this project." (Tr. 30–31) The GM Specifications further provided that the project site was to be available to defendant and its subcontractors to begin their work by February 1, 1981. The original date for substantial completion of the project was between August 15 and September 20, 1981. Two "Binks Bar Charts" (Exs. 80 and 80A) mounted over the desk of Mr. Norm Smith, Binks' superintendent, were allegedly used to plan the sequencing of the project work. (Tr. 314–16) A "bar chart" as explained by Klapp, "is a descriptive means of tying in a piece of work that has to be performed. It will tie it into dates on a calendar, either weekly [or] monthly [and] show when that area of work will start [and] be completed … [T]hat will be tied in to dates … [to] tell the contractors involved in the project the amount of time that they have within which they must start the project and complete the project … or various phases of it." (Tr. 86) At trial, defendant objected to plaintiff's introduction of the Bar Charts, and their use in preparing Exhibits 103, 104 and 105; we reserved decision and address this motion below.

*Pre-Acceleration Period*

Prior to the "Binks job," plaintiff installed mechanical piping on a different portion of the Elpo Building addition as subcontractor to the Polera Building Corporation (Polera). Klapp testified that in January, 1981, the Elpo building was substantially completed. The Binks project was located on the second floor where "¾ of the floor was ready and prepared." (Tr. 11) Steinhebel and Schacterle promised the delivery of the layout drawings to plaintiff "shortly."

In February, 1981, the month in which the project site was supposed to be available for construction to begin, Klapp again requested the layout drawings from Steinhebel and told him that plaintiff was hiring a draftsman, Robert Fisher, to develop some fabrication drawings which would allow plaintiff to start ordering material and to fabricate piping. Steinhebel allegedly agreed that this was a good idea. (Tr. 49–50)

By letter dated March 6, 1981 (Ex. 15), plaintiff requested specific information and drawings from defendant. In pertinent part, the letter reads: "Confirming our phone conversation of this date, it is imperative that we be given sufficient information now to allow us to purchase out the material required for the subject project. To date, we have approximately ten percent (10%) of the total information we need to allow us to purchase pipe, fittings, and valves. We have already been hit with a 12% material escalation [in price] …" Plaintiff's job superintendent, Ray Camardella, testified that despite repeated requests to Steinhebel, drawings, piping layout information and dimensions were "very scarce and very few" during this period of time.

Plaintiff began to install some piping in May of 1981. According to Camardella's job diary entry, GM called a meeting on May 5, 1981 which Camardella attended although no representative from Binks "showed up, therefore, [there was] no meeting."

The voluminous evidence adduced pointed out that delays relating to the lack of layout drawings and information required for the fabrication and field work continued through June of 1981. Although layout drawings were to be prepared by plaintiff through its draftsman Fisher, or by GM, all modifications and additions to these layout drawings were provided by IFE. (Ex. 75; Tr. 120–121, 126) Furthermore, the project site scheduled to be available on February

1, 1981 was not actually ready for construction to begin until mid-March, resulting at the start in a delay of approximately a month and a half.

On June 4, 1981, Leo Harmonay, the president of Harmonay, called a meeting attended by both Binks and GM representatives. He testified at trial that he then expressed his concern that only 10 or 15 per cent of the work had been done although they were 2½ to 3 months away from the scheduled date for testing and debugging (the elimination of malfunctioning elements or error in a system). (Tr. 294) Klapp testified that the GM plant manager, Ray Windas, "said that General Motors was aware that there was a problem ... [and] of the seriousness of that problem, that they had been in constant touch with Binks personnel concerning the lack of drawings, [and] the fact that the job was behind productionwise, installationwise, and they were doing everything possible to try to bring the job back onto schedule." (Tr. 170)

The record is replete with reference to additional sources of project delay, which included defendant's delay in furnishing, installing, or constructing various tanks, decks and platforms—all essential steps prior to plaintiff's installation of piping; additionally the revamping or modification of previously installed piping. At trial, Klapp stated that although the GM work order "Bulletins" (to which were attached written change orders)[5] required certain modifications to be made, these GM bulletins did not cause the project to be delayed more than was anticipated. Moreover, Klapp readily acceded at trial that the only extra work performed for GM by Harmonay was done pursuant to these bulletins (Tr. 248), and that Harmonay had no claims concerning these bulletins or the change orders attached thereto. (Tr. 244)

Instead, the delays due to missing drawings and lack of equipment ready for pip-

ing installation continued through July. Various entries in plaintiff's job diaries indicate that Schacterle was still delivering drawings and making changes on the project site in late July through August. Some of these modifications necessitated removal of up to 50 percent of the material already installed. (Tr. 153–54)

*The Acceleration Period*

The acceleration of the work being done on the project began in early July, 1981 when Harmonay was asked to increase its crew sizes, put on a second shift, and work both crews overtime. In addition, crews were required to sometimes work on weekends and holidays throughout the acceleration period. The parties dispute whether defendant or GM requested the acceleration; nonetheless, the GM Specifications provided for acceleration upon the request of GM under certain conditions of delay.

Klapp testified that Russell Flood, the erection superintendent and subcontractor coordinator of the project for Binks, orally agreed to pay for the overtime portion of the workmen's wages at that time; though promised, Flood did not at that time or thereafter send a written change order confirming this agreement. (Tr. 175) Nevertheless, it is undisputed that all overtime payments incurred by Harmonay were paid. (Tr. 255–56)

In addition to overtime, Klapp testified that he also requested that defendant pay plaintiff for the overhead and profit on this premium time work, and received assurances that it would be worked out after discussions with defendant's office. (Tr. 182–83) Specifically, Steinhebel told him that "it would be worked out;" Flood stated that they would have to "discuss it with General Motors or he would have to discuss it also with his office." (Tr. 183) However, only a portion of the total overhead and profit costs that plaintiff incurred due to the delays was paid by Binks—a 25 percent "premium payments" for a number

5. As explained by Klapp at trial, a "[c]hange order is a written authorization that will be addressed from a person wanting a bit of work to be performed. He will write the change order explaining what he wants done, how he wants [it] done, and issue that written order to the party that he wishes to perform that work." (Tr. 175)

of days upon which Harmonay performed overtime and/or shift work in October, 1981.

*The Motions*

## I. *The Binks Bar Charts*

As evidence that delay was incurred despite the target dates set up in the "Time Schedule," plaintiff attempted to introduce into evidence two "Binks bar charts" (Exs. 80 and 80A) which also indicated that the sequencing of the Elpo System project would extend from February 7 through August 15 while the Phosphate facility installation would progress from March 7 through August 15. Defendant moved to strike their admission, apparently for lack of foundation. (Tr. 97)

We find that the totality of evidence neither rebuts nor refutes the testimony of Camardella that both he and Binks' superintendent Norm Smith consulted these two bar charts mounted over Smith's desk. In addition, defendant's answer to plaintiff's Interrogatory No. 22 admits that defendant prepared the bar charts. Interrogatory 22 reads: "Identify all progress schedules prepared by Binks or any professional for the Project." Defendant (through counsel) answered in pertinent part: "The specifications issued [by GM] for the project, which were incorporated into Harmonay's subcontract by reference, contained a progress schedule which was binding on all contractors and subcontractors on the job. A copy of such schedule is attached hereto as Exhibit 2. *BINKS' personnel prepared bar charts for the completion of the Elpo and Phosphate machines.* Copies of these schedules [the Binks bar charts] are attached hereto as Exhibits 3 and 4." (Emphasis added) Therefore, we find that these bar charts are admissible in evidence as admissions by a party, Fed.R.Evid. 801(d)(2), and have included them in our examination of the proof. Accordingly, we deny defendant's motion to strike the bar charts and testimony relative thereto.

## II. *The Attorneys' Letters*

We have also considered defendant's motion to strike a letter from one of its attorneys. Defendant argues that the letter should not be admitted into evidence as proof of liability because it constitutes a statement made in the course of compromise negotiations. Fed.R.Evid. 408.

At trial, Klapp testified that in April, 1982, an associate at defendant's law firm, Michael Goergen, Esq., asked to meet with officers of Harmonay and Russell Flood of Binks at Harmonay's offices.

Goergen allegedly acknowledged that Harmonay "had difficulties and problems on the job that [had] held [plaintiff] up from performing [its] work" which was partially due to the fact that plaintiff "did not receive layout drawings during the course of the job allowing [plaintiff] to purchase, receive, fabricate and install [its] job in a timely fashion." (Tr. 205) According to Klapp's testimony, Binks' attorney then informed him that defendant was contemplating a lawsuit against Edwin Schacterle and he inquired as to whether Harmonay wished to join in this suit.

By letter to Klapp dated June 3, 1982, Goergen reduced this request to writing. The portion of the letter in dispute reads:

"You and I also discussed the potential law suit between Binks and its design subcontractor, Edwin Schacterle. While you indicated that you had suffered labor losses resulting from Schacterle's actions or inactions, you also indicated your hesitancy to commit your company's resources to a protracted legal battle. The question which would have to be answered to your satisfaction before you would be willing to make such a commitment is whether or not Schacterle has significant insurance coverage."

Rule 408, Fed.R.Evid., provides that:

"[e]vidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. *Evidence of conduct or*

*statements made in compromise nego-
tiations is likewise not admissible."*
(emphasis added)

Defendant argues that the latter portion
of the rule bars admission of Goergen's
letter into evidence. In order to determine
whether the statement in dispute was made
in the course of compromise negotiations,
we must ascertain first whether any com-
promise negotiations actually took place,
and if so, decide whether that statement
was made in the course of these negotia-
tions. 23 C. Wright & K. Graham, Federal
Practice and Procedure § 5307 at 231
(1980).

 While it is true that a statement
is excludible if the party making it is seek-
ing to reach a compromise, we do not find
that any compromise negotiations were ac-
tually taking place in the instant situation.
The statement by Goergen merely refers to
the possible institution of suit by both
plaintiff and defendant as co-parties
against Schacterle. Upon inquiry into the
subjective purposes of the parties, we can-
not say that this statement, which is figur-
atively a solicitation to stay on defendant's
"side of the fence" in case of possible liti-
gation, is the legal equivalent of a state-
ment made in the course of compromise
negotiations. Accordingly, we deny de-
fendant's motion and admit this letter into
evidence.

We find further support for our determi-
nation in the fact that the letter was sent
to Harmonay prior to the existence of an
actual dispute between the instant parties,
and is therefore not privileged as an offer
of compromise. *See Morgan v. Norfolk &
Western Railway Co.,* 473 F.2d 1278 (7th
Cir.1973). It is admissible as an admission
by a party.

Similarly, we have examined a letter to
Goergen from plaintiff's attorney, Allen
Ross, Esq., dated July 28, 1982, which
plaintiff moves to strike. Defendant seeks
admission of this letter in order to impeach
the testimony of Sidney Hecker, comptrol-
ler, which relates to the amount of dam-
ages sustained by Harmonay. In contrast,
this letter states: "In accordance with our

prior discussions and without prejudice to
our clients' respective legal positions, I am
taking the liberty of setting forth below a
summary of the damages suffered by Har-
monay in the performance of its subcon-
tract work with the Binks Manufacturing
Company..." The letter further refers to
plaintiff's anxiety that Ross "proceed as
expeditiously as possible to resolve these
claims." The letter concludes with Ross'
request for "your client's [Binks] earliest
response." Plaintiff argues that this letter
is not admissible under Fed.R.Evid. 408
because it was written during the course of
settlement negotiations.

 At common law, use of the prefato-
ry and "magic" phrase "without prejudice"
clearly indicated that the statement was
being made in the course of compromise
negotiations. Under Fed.R.Evid. 408, em-
ployment of this common law phrase is no
longer dispositive. However, its use may
still be evidence of the intent of the speak-
er which we may rely upon to determine
whether the statement was made "in com-
promise." *See* 23 C. Wright & K. Graham,
Federal Practice and Procedure § 5315, at
291 (1980).

 In the instant case, we find that the
use by counsel for plaintiff of the phrase
"without prejudice," coupled with his list-
ing of the damages, the plaintiff's desire to
resolve the claims, and a request for Binks'
earliest response all indicate that the writ-
er's intent was to send the letter in the
course of compromise negotiations. Since
we find that the evidence offered is within
Fed.R.Evid. 408, we sustain plaintiff's ob-
jection to the admission of this letter as
evidence. We must add that with or with-
out the Goergen statement and/or the Ross
letter, our findings of fact and conclusions
of law would remain the same.

*The Law*

 Before reaching the merits of plain-
tiff's claim, we must decide which state law
governs this controversy. Toward this
end, both parties look to the forum selec-
tion clauses in the prime contract (between

GM and Binks) and in the subcontract. Plaintiff argues that the prime contract controls, for it provides that "the law of the place of the work shall govern," *i.e.,* New York. Under New York law, incorporation clauses in a construction subcontract, which incorporate by reference clauses in the prime contract into the subcontract, bind a subcontractor *only* to the prime contract provisions relating to the scope, quality, character and manner of the work to be performed by the subcontractor. *See Guerini Stone Co. v. P.J. Carlin Construction Co.,* 240 U.S. 264, 277, 36 S.Ct. 300, 60 L.Ed. 636 (1916); *U.S. Steel Corp. v. Turner Construction Co.,* 560 F.Supp. 871 (S.D.N.Y.1983). Despite the incorporation of the GM Specifications (the prime contract in the instant case) into the subcontract by reason of the fact that the agreement of the parties referred to two Harmonay bid quotes of "10–31–80 and 11–21–80," both of which in turn refer to the Specifications, plaintiff contends that the exculpatory "no damages for delay" clause in the Specifications cannot be applied to the subcontract since the clause does not affect the scope, quality, character and manner of the plaintiff's work. The clause, a part of the Contract General Conditions in the Specifications, provides:

> "Contractor agrees that whether or not any delays shall be the basis for an extension of time, he shall have no claim against the Owner for an increase in the Contract price, nor a claim against the Owner for a payment of any kind for damage, loss or expense resulting from delays; nor shall the Contractor have any claim for damage, loss or expense resulting from interruptions to, or suspension of, his work to enable other Contractors to perform their work. The only remedy available to the Contractor shall be an extension of time."

Finally, plaintiff argues that even if the GM Specifications apply, only defendant as "Contractor" is bound by the terms of the exculpatory clause; that all extra work

claims are governed by the subcontract agreement (to be discussed *infra*) which sets forth that contract modifications—such as the extra work claims in issue here—shall be "equitably adjusted."

Defendant counters that the forum selection clause in the subcontract governs. The Binks/Harmonay purchase order (the subcontract), a standard printed form, provides that the "contract resulting from the acceptance of this order is to be construed according to the law of the state from which this order issues, which is printed on the opposite side hereof." Defendant's corporate headquarters address in Franklin Park, Illinois, is clearly the state so printed.[6] Defendant thus argues that Illinois law should govern their controversy, and that the law of that state incorporates by reference the exculpatory "no damages for delay" clause for extra work contained in the GM Specifications of the Binks/GM prime contract. In short, the defendant insists that all claims for compensation for extra work are barred by the incorporation of this clause.

*I. Choice of Law*

■ Jurisdiction in this case rests on diversity of citizenship, 28 U.S.C. § 1332, and therefore the Court must apply the substantive law of the forum state, including the conflict of law rules. *See Klaxon v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Thus, New York law applies to the conflicts question raised herein. *See La Beach v. Beatrice Foods Co.,* 461 F.Supp. 152 (S.D.N.Y. 1978); *Business Incentives Co., Inc. v. Sony Corp. of America,* 397 F.Supp. 63 (S.D.N.Y.1975).

While it is true that some jurisdictions give determinative effect to a choice-of-law clause and thereby follow the so-called "autonomy rule," *see* Note, *Effectiveness of Choice-of-Law Clauses in Contract Conflicts of Law: Party Autonomy or Objective Determination?,* 82 Colum.L.Rev. 1659, 1660 (1982), New York is not one of them. *See La Beach, supra; Southern*

---

**6.** The typewritten words, "Originated in Detroit" are also on the form; however, we are of the opinion that the word "printed" refers to the state of Illinois and not Michigan.

*Intern. Sales Co. v. Potter & Brumfield,* 410 F.Supp. 1339 (S.D.N.Y.1976); *Business Incentives Co., supra; Fricke v. Isbrandtsen Co.,* 151 F.Supp. 465 (S.D.N.Y. 1957).

■ A better rule, suggested by Judge Learned Hand, is that such clauses are prima facie valid and will be upheld absent a showing that they result from fraud or overreaching, that they are unreasonable or unfair, or that enforcement would contravene a strong public policy of the forum. *See Krenger v. Pennsylvania R. Co.,* 174 F.2d 556, 560–61 (2d Cir.) (L. Hand, Ch. J., concurring), *cert. denied,* 338 U.S. 866, 70 S.Ct. 140, 94 L.Ed. 531 (1949); *Bense v. Interstate Battery System of America, Inc.,* 683 F.2d 718, 721–22 (2d Cir.1982); *Richardson Greenshields Securities, Inc. v. Metz,* 566 F.Supp. 131, 133 (S.D.N.Y. 1983).

The "substantial relationship" approach followed in New York, which parallels Judge Hand's rule, is stated succinctly in Restatement (Second) of Conflicts of Law § 187. *See Nakhleh v. Chemical Construction Corp.,* 359 F.Supp. 357 (S.D.N.Y. 1973). In relevant part, that section states:

> "(2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue (i.e., questions of validity, formalities and capacity) unless either.
> (a) the chosen state has no substantial relationship to the parties ... or
> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state ..."

■ Thus, although New York does recognize the choice-of-law principle that parties to a contract have a right to choose the law to be applied to their contract, *see Compania de Inversiones Internacionales v. Industrial Mortgage Bank of Finland,* 269 N.Y. 22, 198 N.E. 617 (1935), this freedom of choice on the part of the parties is not absolute. *See Nakhleh, supra.*

With respect to the substantial relationship test, the New York Court of Appeals has held that while the parties' choice of law is to be given considerable weight, the law of the jurisdiction with the "most significant contacts" is to be applied. *Haag v. Barnes,* 9 N.Y.2d 554, 559–60, 175 N.E.2d 441, 216 N.Y.S.2d 65 (1961); *see La Beach, supra,* at 155–56; *Southern Intern., supra,* at 1341.

■ Under this analysis, the parties' "choice" of Illinois law in the Binks standard printed form diminishes when viewed against the facts of the case. The only Illinois contact is that it is the principal place of defendant's business. The contract itself was executed in Michigan. On the other hand and most impressive are these factors: the place of performance of the work was in New York, all negotiations for the extra work and other claims occurred in New York, the prime contract is governed by the law of New York, and plaintiff, a New York corporation, has its principal place of business in New York. Illinois has no substantial relationship to the parties and New York would seem to have a materially greater interest in the application of its law. In light of the foregoing, the rights and duties of the parties to the contract are to be governed by the law of New York, despite the "agreement" of the parties to the contrary.

As we have already stated, incorporation clauses in a construction subcontract in New York bind a subcontractor to the provisions of the prime contract which relate only to the scope, quality, character and manner of the subcontractor's work. *See Guerini Stone Co., supra; U.S. Steel Corp., supra.* Unrelated prime contract provisions "such as a 'dispute' clause governing the resolution of monetary claims between the project owner and general contractor [similar to the "no damages for delay" clause in issue], are not incorporated by reference into a subcontract." *See U.S. Steel, supra,* at 874.

Furthermore, we find that despite defendant's numerous arguments to the contrary, a disputes clause such as the "no damages for delay" clause in issue basically provides the procedural means for the determination of liability between the owner, GM, and the prime contractor (*i.e.,* defendant) in case a dispute arises. Plaintiff, as a subcontractor, is not a party to that contract, even though it is incorporated by reference into its subcontract, and it has no rights thereunder. *See John W. Johnson, Inc. v. Basic Construction Company,* 429 F.2d 764, 775 (D.C.Cir.1970).

Accordingly, we find that defendant's liability for breach of contract is not precluded on the basis of the "disputes" clause of the prime contract.

### A. Plaintiff's Claims

Plaintiff contends that defendant materially breached its contract by reason of the delay and consequent acceleration of the project, which caused plaintiff to incur substantial damage.

In order for plaintiff to establish that defendant breached the contract, plaintiff must show that the contractor caused a substantial delay in performance, that the contract terms forbade such a delay, and that the plaintiff was injured as a result. *See U.S. for the Use of Gray-Bar Electric Co., Inc. v. J.H. Copeland & Sons Construction, Inc.,* 568 F.2d 1159 (5th Cir. 1978). We now proceed to examine each of those elements.

### 1. Delay in Performance

The time schedule of the prime contract, incorporated into the subcontract because it relates to the scope, quality, character and manner of plaintiff's work, provided that the site availability for the start of the project installation would be February 1, 1981; that equipment installation would be complete by August 15, 1981; that tune-in and debugging would proceed from August 15, 1981 to September 20; and that production would start up on September 28, 1981. The totality of the evidence indicates that an initial delay of one and a half months was not due to the fault of either plaintiff or defendant, but rather to the failure of the project site to be available on time. However, the record is replete with instances of defendant's failure to provide layout drawings in a timely and orderly manner. In addition, defendant made numerous design changes that altered the character of plaintiff's work. *See, e.g., Niagara Mohawk Power Corp. v. Graver Tank & Mfg. Co.,* 470 F.Supp. 1308 (N.D.N.Y.1979). Defendant's delays and alterations required plaintiff to work on an accelerated basis, increasing its crews, hours, and overhead costs.

### 2. The Contract Terms

The applicable provisions of the subcontract agreement which pertain to delay and extra work provide:

EXCUSABLE DELAYS Seller [Harmonay] shall not be responsible for delays or defaults in delivery, nor the Buyer for failure to receive, if occasioned by war, strikes, fires, acts of God, or public enemy, labor or transportation difficulties, or any other causes beyond the control of the party in default...

MODIFICATION Buyer [Binks] reserves the right at any time to make changes in drawings and specifications as to any material and/or work covered by this order. Any difference in price or time for performance resulting from such changes shall be equitably adjusted. All other modifications or variations of the contract in order to be binding shall be in writing and signed by the parties through their fully authorized agents.

Several clauses of the prime contract incorporated in the subcontract also bear upon the defendant's liability.

First, the Specifications allowed GM to accelerate the project if delayed under certain conditions by requiring the contractor to perform overtime without additional cost to GM. (Ex.10, D–189, p. 1)

Second, Article 30 of the Contract General Conditions in the Specifications provided "[t]he Contractor shall be responsible for his work and every part thereof ...;" and

Article 31 therein also provided the "Contractor agrees that anything necessary on the part of his trade to eliminate interferences and to make possible the work of other trades is to be done as part of the Contract without additional expense to the Owner."

Third, the "Scope of Work" section of the GM Specifications mandated "[t]he Contractor shall start preparing shop drawings and shall submit the same, together with engineering data, to the Owner for approval, progressively and as rapidly as required to meet the construction schedule..."

### 3. *Injury to Plaintiff*

Plaintiff has presented ample evidence to support its allegations of injury which we shall examine in more detail in the section on damages below.

In sum, we find from the persuasively credible proof; defendant caused unreasonable and substantial delays in the progress of plaintiff's work and its ordering of materials by failing to produce the layout drawings and by altering many of those plaintiff obtained; that defendant's delays were neither excusable as defined in the subcontract nor in the spirit of responsibility placed upon defendant by its prime contract with GM. Accordingly, on the credible facts adduced at trial and the law applicable thereto, we are compelled to find defendant liable for breach of contract.

■■■ We find further support of our conclusive factual findings in the general rule that if facts existing at the time a building contract is made or which occur thereafter render the performance of the contract more expensive or difficult than anticipated, the risk falls on the contractor, and he has the duty to perform his contract despite the added difficulties or cost. *See Day v. United States*, 245 U.S. 159, 38 S.Ct. 57, 62 L.Ed. 219 (1917); *North Shore Sewer and Water, Inc. v. Corbetta Construction Co., Inc.*, 395 F.2d 145 (7th Cir. 1968); Restatement of Contracts § 467 (1932). This rule is based upon the fact that a contractor will typically "build in" a certain amount of leeway for difficulties in his original bid quotation. As thoughtfully explained elsewhere,

> A general contractor who bids a single contract job has the power to select his own specialty subcontractors. He knows their respective abilities to cooperate with him in completing the job. The general contractor can accordingly decrease the coordination factor he includes in his bid. Similarly, the specialty subcontractors will know the general contractor's ability to coordinate. They too can decrease their coordination contingencies in their subcontract bids. Where multiple prime bidding occurs, followed by assignment or delegation of the duty of coordination, the separate primes must include a large contingency relative to coordination in their bid prices. A specialty contractor with a history of discord on multiple prime jobs could be one of the contractors awarded a contract on the project, and a contractor with a proven inability to coordinate could be the assignee of coordination responsibilities. The assignee and coordinator would undoubtedly include in their contract prices sums for the coordination responsibilities.

Goldberg, *The Owner's Duty to Coordinate Multi-Prime Construction Contractors, A Condition of Cooperation*, 28 Emory L.J. 377, 399, n. 83 (1979).

■■■ Balancing this risk factor, however, is the well-established rule that a contractor is entitled to a reasonable opportunity to perform his contract without obstruction or interference, and that neither party will do anything that will hinder or delay the other party in performance of the contract. *See Quaker Empire Construction Co. v. D.A. Collins Construction Co., Inc.*, 88 A.D.2d 1043, 452 N.Y.S.2d 692 (3d Dept.1982); *Fehlhaber Corp. v. State of New York*, 65 A.D.2d 119, 410 N.Y.S.2d 920 (3d Dept.1978), *appeal denied*, 48 N.Y.2d 604, 396 N.E.2d 486, 421 N.Y.S.2d 1029 (1979). As a consequence, delay and improper performance of preparatory work not within the contemplation of the parties at the time the contract is executed will

constitute a material breach of this implied obligation. *See Quaker, supra.*

We find that defendant's failure to satisfy its obligations owed plaintiff caused a breach of contract. We are not persuaded by the defense interposed herein that its "independent contractor," Schacterle, is the culpable party. It was ultimately defendant's responsibility under the prime contract to produce the necessary drawings in a timely and orderly fashion and to choose appropriate methods to enforce the progress schedule as well as to prod along any delinquent contractor. Similar to the effort that an owner must exercise in order to coordinate contractors, we are of the opinion that "[t]here comes a time in dealing with a contractor whose performance is failing when reminders must give way to exhortations, admonitions and specific demands." *See National Steel and Shipbuilding Co. v. United States,* 419 F.2d 863, 876, 190 Cl.Ct. 247 (1969). *But see Taylor-Fichter Steel Construction Co. v. Niagara Frontier Bridge Commission,* 261 A.D. 288, 25 N.Y.S.2d 437 (2d Dept.1941).

Under these circumstances, plaintiff could elect not to abandon the contract, decide to complete it and sue for damages traceable to defendant's breach. *See Shalman v. Board of Educ. of Cent. School Dist. No. 1,* 31 A.D.2d 338, 297 N.Y.S.2d 1000 (3d Dept.1969). In light of the foregoing, we find that plaintiff is entitled to recover damages incurred because of the breach of contract incurred by Binks.

*Damages*

Having concluded that defendant is liable, we must now consider the proper apportionment of damages.

Defendant preliminarily argues that plaintiff cannot recover damages for two reasons: (1) plaintiff waived all damages claims by accepting final payment, and (2) an accord and satisfaction had been reached between the parties which operates to bar the relief sought. We are not so convinced.

Although a clause in the GM Specifications contract (Ex.10) between the owner (GM) and the contractor (Binks) mandated a waiver of damages claims if final payment was accepted, no such provision was contained in the subcontract. For reasons we have already set forth in detail, the subcontract, not the prime contract, governed the obligations of plaintiff and defendant with respect to these type of clauses. Therefore, the waiver argument is inapplicable.

Similarly, we do not find that an accord and satisfaction had been reached between the parties; *i.e.,* an agreement, express or implied, between two parties under which one party accepts a stipulated performance by the other party in discharge of an unresolved obligation by the latter. *See Stahl Management Corp. v. Conceptions Unlimited,* 554 F.Supp. 890 (S.D.N.Y.1983). Thus, in order to establish an accord and satisfaction, there must be shown an expression of intent by the parties to discharge the old obligation when the new one has been performed. *See Rein v. Wagner,* 49 Misc.2d 683, 268 N.Y. S.2d 659, 662 (Sup.Ct.1965), *modified,* 25 A.D.2d 356, 269 N.Y.S.2d 578 (3d Dept. 1966), *aff'd,* 18 N.Y.2d 989, 224 N.E.2d 728, 278 N.Y.S.2d 223 (1966). Clearly defendant bears the burden of proving this defense. *See Stahl, supra,* at 893.

In the instant case, Binks merely alleges that during the late summer and early fall of 1981, Harmonay sought and received from Binks a 25 percent premium for a number of unspecified days upon which overtime or shift work was performed, and asserts that such payment comprised a settlement of plaintiff's cost overruns. Absent any evidence of the parties' intent, oral or written, to reach an accord, defendant has failed to meet its burden. Accordingly, we find that the defendant has not demonstrated any theory which would operate to bar the relief sought.

For the sake of clarity, we note that neither party disputes that the following

payments were in fact made to plaintiff: (1) Bulletin costs ordered and paid for by GM with 15 percent overhead and 10 percent profit markup; (2) Change orders ordered and paid for by GM with 15 percent overhead and 10 percent profit markup; (3) Binks ordered extra work; and (4) Binks-ordered overtime work. (Tr. 262)

Plaintiff urges essentially three categories of delay damages: labor inefficiency, overhead and profit on overtime work, and extended field costs. Specifically, these include the following claims: (1) loss of efficiency—$275,923.04; (2) overhead and profit on overtime—$46,754.10; (3) materials price escalation—$8,329.00; (4) a hired draftsman—$13,603.00; (5) equipment delay—$8,481.01; (6) excess supervision—$174,225.98; and (7) interest on any damages awarded from the date of the project completion in February, 1982. In summary, plaintiff seeks total damages of $527,-315.13. We consider these claims seriatim.

## I. Labor Inefficiency

The first item of delay damage claimed is the lack of productivity or efficiency of plaintiff's labor force. In order to award damages for labor inefficiency, we must consider: (1) proof of such loss; and (2) the proper amount, if any, of such damages.

Harmonay contends that during the acceleration period of June 1 through September 30, 1981, it suffered at least a 30 percent decline in productivity among its entire work force due to excessive working hours, overly crowded conditions, the unavailability of tools, materials and storage, defendant's delay in supplying drawings and equipment, and the constant revision in the contract drawings—all of which resulted in confusion and interruption of the orderly progress of work.

Plaintiff's proof of these damages consists of testimony by Harmonay and Camardella, expert testimony by Klapp relative to his personal observations and estimation of job site conditions, and financial data based upon labor costs incurred.

Klapp testified that in June, 1981 an agreement was reached between Binks, Harmonay, and GM to meet the September 28, 1981 production date as directed by GM. Thereafter, Harmonay employed not only a day crew from 7 a.m. to 6 p.m., but also a second shift from 3:30 p.m. to 11 p.m., and for two (2) weeks a third shift from 11 p.m. to 7 a.m. (Tr. 523) Figures based upon plaintiff's Payroll Ledger (Ex. 83) indicate that its crew size increased from 26 to an average of 54 in July, 66 in August and 78 in September—after peaking at 98 in mid-September. (Ex. 120) Camardella, plaintiff's job superintendent, further testified that each of his men on both morning and afternoon shifts worked 67 to 70 hours per week for a period of ten to 12 weeks. (Tr. 393) Illustrative of the working conditions during acceleration is Klapp's observation that "[plaintiff] ha[d] more than double the size of our crew, the electricians, both of them, had increased their crews [as had] Binks ... [and] [t]he area of work had become smaller because now everybody is pushing to bring material on the job, [and] ... more tools ... [and] more equipment ... which had to be put at the feet of this added personnel ..." (Tr. 524) He analogized the situation to "a zoo, a fiasco, a nightmare." (Tr. 524)

In addition to plaintiff's gross increase in number of hours and number of workers, evidence adduced at trial demonstrated a decrease in productivity. Klapp testified that the usual measure of productivity on a construction job is called a "gang day," i.e., how much pipe two workers can install in a day. (Tr. 515) A gang day is the unit of measurement by which productivity of mechanics and plumbers is measured in the plumbing and mechanical trades. (Tr. 515) During acceleration, he estimated that the amount of pipe installed per gang day had fallen off between 10 percent and 30 percent for smaller pipes, and as much as 50 percent for the 6 inch to 8 inch pipes in some areas. (Tr. 534–36)

Defendant attempts to impeach plaintiff's evidence by arguing that plaintiff's Payroll Ledger (Ex. 83) does not reveal whether a workman was working solely on the Binks project, or on the concurrent Harmonay/Polera project at the GM site.

We find, however, that plaintiff's work crew size figures are substantiated by the Daily Labor and Material Vouchers submitted during acceleration to Binks for payment. These vouchers list each worker on the Binks project by name with the overtime hours, and are signed off by Russell Flood, Binks' superintendent. (Exs. 123, 124, 125; Tr. 736–41) Our reliance on the information recited in the vouchers is further bolstered by the deposition testimony of Leo Harmonay, which indicates that plaintiff's loss of efficiency claims are based upon a review of its books. (Tr. 587)

We thus find convincing plaintiff's proof of loss of labor efficiency as a consequence of the delay incurred. As a legal matter, however, we must decide whether such damages, uncertain in their amount, are compensable. It is fundamental to the law of damages that one complaining of injury has the burden of proving the extent of the harm suffered; delay damages are no exception. *See Berley Industries, Inc. v. City of New York*, 45 N.Y.2d 683, 385 N.E.2d 281, 412 N.Y.S.2d 589 (1978); *Manshul Constr. Corp. v. Dorm. Auth. of N.Y.*, 79 A.D.2d 383, 436 N.Y.S.2d 724 (1st Dept.1981) (delay damages based solely upon pre-contract estimates of costs are impermissible).

On the other hand, courts have often recognized that the extent of harm suffered as a result of delay, such as the loss of efficiency claim in issue, may be difficult to prove. Thus, courts have recognized that a plaintiff may recover even where it is apparent that the quantum of damage is unavoidably uncertain, beset by complexity, or difficult to ascertain, if the damage is caused by the wrong. As the New York Court of Appeals commented: "The law is realistic enough to bend to necessity in such cases." *Berley, supra*, 385 N.E.2d at 283, 412 N.Y.S.2d at 591. Speaking specifically on the issue of loss of efficiency claims, the court in *Luria Bros. & Co., Inc. v. United States*, 369 F.2d 701, 712, 177 Cl.Ct. 676 (1966) similarly observed: "That loss of productivity of labor resulting from improper delays caused by defendant is an item of damage for which plaintiff is entitled to recover admits of no doubt; nor does the impossibility of proving the amount with exactitude bar recovery for the item." [citations omitted]

Thus, we find that the general rule barring recovery of uncertain damages is applicable only where damages incurred are not causally connected to the wrong; further, those damages which "are definitely attributable to the wrong and only uncertain in respect of their amount" are recoverable. *See Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562, 51 S.Ct. 248, 75 L.Ed. 544 (1931).

Accordingly, in light of the foregoing principles and our factual findings, we are compelled to conclude that the loss of efficiency incurred by plaintiff is a compensable item of damage for which recovery is warranted.

We next address the correct approximation of such damages. Plaintiff asserts that it is entitled to $275,923.04, that is, 30 percent of the total wages paid by Harmonay plus fringe benefits ($919,743.46) during the July 1 through September 30 acceleration period.[7]

Plaintiff admits that the 30 percent factor had first suggested itself to Klapp as a plausible formula for inefficiency after he read of it in a union manual of the Mechanical Contractor's Association; apparently, the manual specifically advised the 30 percent figure for damages stemming from such a claim. Plaintiff's argument is further supported by the testimony of its witnesses Leo Harmonay and Klapp, both of whom, after conducting on-site observa-

---

**7.** The formula used by Harmonay to calculate this sum is as follows: Total wages paid by Harmonay during acceleration, $740,094.29, minus $176,432.38, a credit to Binks for the overtime wages it paid, equals $563,671.91. $563,671.91 multiplied by the percentage used to calculate fringe benefits on wages paid by Harmonay in accordance with union requirements, in this case, 63.17% (Ex. 114), equals $919,743.46, wages plus fringe benefits paid to the union. $919,743.46 multiplied by 30% loss of efficiency factors equals $275,923.04.

tions of the conditions and reviewing plaintiff's books, estimated a minimum of 30 percent inefficiency.

Binks counters, however, that the 30 percent factor is speculative and warrants rejection or reduction on the grounds, *inter alia*, that: (1) Klapp testified that labor efficiency was high until July, 1981 (Tr. 522), and (2) the figure was not based on personal observation but on a formula developed in a manual not in evidence.

Although Klapp did testify to labor efficiency until July, 1981, plaintiff's Payroll Ledger (Ex. 120) recorded a disproportionate inefficiency in mid-September when the work crew had to be increased from 26 people to 98. Furthermore, the 30 percent figure is buttressed by the on-site observations of Leo Harmonay and Klapp, who estimated that percentage of average inefficiency for the full acceleration period. Based on the total trial record, we adopt as true and convincing the version of facts revealed by these two witnesses. Moreover, defendant has offered no persuasive rebuttal evidence or calculations to warrant a contrary conclusion.

Defendant is correct, however, in pointing out the failure of plaintiff to introduce into evidence the manual of the Mechanical Contractor's Association which allegedly advised that 30 percent of total wages and fringe benefits was an appropriate amount of loss of efficiency damages. We repeat, however, that we are persuaded by the uncontradicted testimony of Leo Harmonay and Klapp that their personal observations led them to agree with the 30 percent figure.

■ Accordingly, we conclude that the record fully supports plaintiff's position that the estimated average inefficiency for the *total* acceleration period was 30 percent of the actual costs in wages and fringe benefits expended by Harmonay. Since we find that plaintiff's calculation is accurate and note that defendant does not contest the figures on which plaintiff's claim for $275,923.04 is based, we hold that plaintiff may recover that amount for loss of efficiency damages.

## II. *Overhead and Profit*

Plaintiff next claims entitlement to a delay damage of 15 percent of overtime wages for overhead, totaling $26,464.86, and 10 percent profit on its net costs for overtime, shift time and premium time during acceleration, totaling $20,289.72. The total overhead and profit damages claimed is $46,754.10.[8] It is undisputed that Binks paid the underlying net costs during the acceleration period.

■ Home office overhead is generally considered a compensable element of delay damages. *See Guy James Construction Co. v. Trinity Indus., Inc.*, 644 F.2d 525 (5th Cir.1981), *modified*, 650 F.2d 93 (5th Cir.1981); *Luria Bros., supra; Manshul, supra.* An oft-recognized basis for an award of these costs has been explained as follows:

> The price of a construction contract typically includes a percentage added for overhead to the project's estimated cost. This addition covers the contractor's continuous business expenses, which encompass such indirect costs as home office salaries, supplies, utilities, and rent. Not included in the contract price are the additional home office expenses that accrue when a delay postpones completion of the project. Thus, if the contractor does not cause the delay, he may recover these expenditures from the responsible party.

Note, *Home Office Overhead as Damages for Construction Delays*, 17 Ga.L.Rev. 761, 761–62 (1983).

■ Judicial treatment of profit as a percentage above direct costs is similar; it has frequently been allowed on a *quantum meruit* basis in construction contract

---

8. These figures are derived as follows: The overtime payments during the acceleration period are $176,432.38; that figure multiplied by 15% overhead, equals $26,464.86. Adding these two figures together, *i.e.*, overtime payments ($26,464.86) equals $202,897.24. Ten percent profit of this latter figure comes to $20,289.72.

cases. *See Whitmyer Bros., Inc. v. New York,* 63 A.D.2d 103, 406 N.Y.S.2d 617 (3d Dept.1978), *aff'd,* 47 N.Y.2d 960, 962, 393 N.E.2d 1027, 419 N.Y.S.2d 954 (3d Dept. 1979); *Manshul, supra,* 436 N.Y.S.2d at 731; *Fehlhaber Corp. v. New York,* 65 A.D.2d 119, 410 N.Y.S.2d 920 (3d Dept. 1978), *appeal denied,* 48 N.Y.2d 604, 396 N.E.2d 486, 421 N.Y.S.2d 1029 (1979).

In the instant case, the subcontract price included 15 percent overhead and 10 percent profit costs. Defendant argues that plaintiff is not entitled to receive an award for overhead and profit on the overtime wages incurred during the acceleration period because there was no written agreement relating thereto. As support, Binks points to that portion of the subcontract entitled "Modification" which states:

> "[Binks] reserves the right at any time to make changes in drawings and specifications as to any material and/or work covered by this order. Any difference in price or time for performance resulting from such changes *shall be equitably adjusted.* All other modifications or variations of the contract in order to be binding shall be in writing and signed by the parties through their fully authorized agents." (emphasis added) (Ex. 9)

Defendant submits that plaintiff's overhead and profit claims are waived by failure to comply with this provision.

 Extra work provisions like the one in the Binks/Harmonay subcontract are inapplicable when extra work to be performed by the subcontractor is orally directed by the contractor and is outside the scope of the contract. Thus, notwithstanding a contract provision that any extra work must be supported by a written authorization, when a party knowingly receives and accepts the benefits of extra work outside the scope of a construction contract orally directed by himself and his agents, such conduct constitutes a waiver of the requirement. *See Davis Accoustical Corp. v. Nat'l Sur. Corp.,* 27 A.D.2d 624, 275 N.Y.S.2d 925, 927 (3d Dept.1966) where the court stated that "a prohibition against oral amendments may be waived as

may any other provision by agreement between the parties;" *LaRose v. Backer,* 11 A.D.2d 314, 203 N.Y.S.2d 740 (3d Dept. 1960), *amended on other grounds,* 11 A.D.2d 969, 207 N.Y.S.2d 258 (3d Dept. 1960), *aff'd,* 11 N.Y.2d 760, 181 N.E.2d 632, 226 N.Y.S.2d 695 (1962).

 The trial record herein convincingly reflects that defendant not only required plaintiff to perform work far beyond the call of the subcontract, but that defendant also orally agreed to pay plaintiff for both overtime as well as overhead and profit costs, neither of which were confirmed by subsequent written agreement.

We therefore find that plaintiff's failure to submit signed modifications in writing to defendant does not preclude it from claiming overhead and profit costs.

As we have already recited in considerable detail, the delays caused by defendant resulted in an increase to plaintiff in the number of workers, hours and costs. The overtime costs incurred by plaintiff also kept multiplying; Klapp testified with conviction that "once the overtime started to get out of hand and [grow] from working a Saturday to [an entire weekend], then ultimately [to] working a second shift, ... here I was looking at expending thousands and thousands of dollars very quickly." (Tr. 286) Finally, plaintiff was forced to take out a bank loan to meet the weekly payroll demands. (Ex. O, at 40–46)

When the financial consequences of the overtime period finally struck plaintiff, Klapp testified that he had several telephone conversations with Steinhebel at Binks, requesting "a fair markup for overhead and profit that was involved in arranging for all this premium time labor," *i.e.,* for obtaining mechanics as well as supervision for additional men, and for putting them all on the job. (Tr. 274–75) According to Klapp, Steinhebel responded that the request "would be worked out at a later date." (Tr. 276) At the same time, Klapp requested instructions from him as to the proper procedure for submitting the Daily Labor and Material Vouchers for payment of the overtime costs. Steinhebel

told him he would only be allowed to submit on the forms the wage rate for hours expended and fringe benefits involved (Tr. 275); plaintiff was not to submit other costs (such as overhead and profit) on the vouchers. As we already have stated, we find Klapp's testimony credible. The sole rebuttal testimony offered by Flood confirms that Klapp demanded overhead[9] on the overtime in June or early July, 1981, and while disputing that Binks agreed to pay this sum (Tr. 446), concedes that Binks' representatives had told Klapp that they would consider the request which would have to be okayed by Binks' vice-president, Mr. Burke Roche. (Tr. 455)

■ Based on defendant's insistence that plaintiff complete its work notwithstanding the delays caused by defendant and the consequent costs not contemplated by the subcontract but incurred by plaintiff, as well as defendant's assurances that plaintiff would be paid its overhead and profit costs despite its failure to put the requests in writing, we find that plaintiff did not waive its claims to these damages. In short, defendant cannot knowingly receive and accept the benefits of the extra work it orally directed without adequately compensating plaintiff for the reasonable value of those services rendered, including the overhead and profit margin "lost" on the job due to defendant's delays.

Having concluded that plaintiff did not waive its right to recover overhead and profit costs, we must now address the applicability of these damages in the instant case.

■ Evidence that the delay precipitated engineering or design problems that called for central staff consideration will suffice to satisfy the burden of proving an increase in overhead. *See Manshul, supra,* 436 N.Y.S.2d at 729; *Berley, supra,* 385 N.E.2d at 283, 412 N.Y.S.2d at 591. In the instant case, the record adequately and convincingly supports plaintiff's allegations of an inordinate work force, resultant payroll adjustment, hiring of extra supervision

and central staff consideration of resultant problems; and that the overhead and profit damages sought are based solely upon the excess overtime wages paid out during the delay period of June through September, 1981. Consequently, we find that plaintiff is entitled to an award equal to the sum of these overhead and profit figures as the overhead and profit damage due to delay.

■ Furthermore, we are persuaded that plaintiff's calculations of the amount of these damages is correct. Klapp testified that prior to bidding on the project, Steinhebel instructed him to complete certain proposal forms to accompany Harmonay's confirmation of its proposal to Binks. According to Klapp, both men were discussing the items on the forms over the phone when Steinhebel requested that Klapp fill in a percentage for overhead and profit on extra work; following Klapp's response of 15 percent overhead and 10 percent profit by way of markup, Steinhebel stated, "Fine ... indicate it on [the form] ... I feel that will be acceptable." (Tr. 537–39) In addition, Flood testified that Klapp had requested a 25 percent markup on overtime during the early stages of acceleration. (Tr. 446, 454) The 25 percent markup sought is based upon the actual cost of overtime wages paid during the acceleration period. Consequently, we conclude that plaintiff's calculation of the amount of these damages is correct. Accordingly, we award plaintiff overhead and profit damages in the amount of $46,754.10.

### III. *Labor, Material and Extended Field Costs*

The five remaining claims of delay damage asserted by Harmonay comprise the company's expenses for labor, material, and extended field work and include: (A) a materials' price escalation claim in the amount of $8,329.00 ("Victaulic piping claim"); (B) a hired draftsman claim of $13,603.00 ("Robert Fisher claim"); (C) an equipment costs claim stemming from the delay of $8,481.01; (D) an excess supervi-

---

9. It is unclear from the transcript whether 20% or 25% was requested by Klapp.

sion claim of $174,225.98; and lastly, (E) a claim for interest due from the date of project completion.

### A. The Victaulic Piping Claim

Plaintiff alleges that it was required to purchase "Victaulic" brand piping materials for the project in individual or small lots after a scheduled 12 percent price increase (Tr. 551) had occurred in March, 1981 (Exs. 71, 72) due to Binks' failure to timely provide layout drawings specifying the pipe sizes required; this resulted in increased and extra costs to plaintiff of $8,329.00. In support of this claim, plaintiff produced a quote obtained from its supplier (Ex. 12); price lists before and after March 1, 1981 (Exs. 71, 72); purchase orders (Ex. 73), and Klapp's trial testimony supporting and recapitulating these figures. (Tr. 549–54; Ex. 118) We also note a letter from Klapp to Steinhebel at Binks dated March 6, 1981 confirming the receipt of only 10 percent of the information needed to purchase pipes, fitting and valves, and the 12 percent materials price escalation. (Ex. 15)

Defendant concedes that under the GM Milestone Schedule, the date for submission of drawings—upon which purchase of the piping materials was dependent—was set down for January 15, 1981. It points out, however, that plaintiff did not obtain a quotation from its supplier until January 19, 1981. (Tr. 550) Binks accordingly argues that this claim is contingent upon proof that the piping materials could or would have been purchased by plaintiff before the price increase went into effect. Defendant further asserts that plaintiff may have decided to order Victaulic piping on an as-needed basis due to plaintiff's assumed anticipation of possible on-site storage difficulties.

First, we note that defendant ignores the fact that "early" ordering is not only possible but often necessary due to the lead-time between ordering materials and receiving them. See, e.g., Whitmyer Bros., Inc., supra, 406 N.Y.S.2d at 620. Second, Klapp's testimony and plaintiff's supporting exhibits have convinced us that plaintiff would have bought the materials before the 12 percent price escalation had become effective, but was so precluded since most of defendant's drawings were not submitted until March, 1981. The consequent significant extra cost plaintiff incurred is an item of damage for which plaintiff is entitled to recover. Accordingly, we award plaintiff the sum of $8,329.00, which we find to be a fair and reasonable amount for "Victaulic piping" damages.

### B. Equipment Delay Claim

Harmonay further claims that it incurred excess field costs for items such as cutting equipment and trailer and telephone rentals because the project, originally scheduled for completion before October 1, 1981, was not actually finished until February 28, 1982. (Tr. 548) The total damages claimed for equipment delay is $8,481.01; it was computed by Mr. Sidney Hecker, comptroller for Harmonay, who prepared cost summaries of field costs for each month between and including October, 1981 and February, 1982. (Exs. 89–94)

It is well known that extended field costs incurred after the scheduled completion date of a project are recoverable as additional and direct expenses to the injured party. However, the fact that these items are incurred after the scheduled completion date is not dispositive; a court should ascertain whether the items are duplicative, exaggerated, or partially included in allowed claims for extra work. See Manshul, supra, 436 N.Y.S.2d at 729.

In view of the total evidence adduced at trial, we find that plaintiff's costs for equipment delay are warranted and reasonable. Accordingly, we award $8,481.01 to plaintiff for these damages.

### C. The Hired Draftsman Claim

Plaintiff additionally seeks recovery of the salary and travel expenses of Robert Fisher, the draftsman allegedly retained to develop fabrication drawings not timely supplied by Binks.

The record reveals that in January and February of 1981, Camardella, Harmonay's project superintendent, assisted Fisher,

Harmonay's draftsman, in reviewing drawings, and, together with Klapp, obtained information for Fisher to use in preparing fabrication drawings. Fisher prepared these drawings and sent them to Schacterle for approval; although he worked out of Harmonay's New York office, he sometimes travelled to Schacterle's office in Michigan. (Tr. 52)

Despite some conflict in the evidence as to when Fisher was hired (Tr. 49, 374, Ex. 77A), the record reflects that the costs for his services extend only from his hiring in January, 1981 until his termination from employment in May, 1981. (Ex. 96) Accordingly, Binks rejects the compensable nature of this claim, arguing that Fisher's early date of termination evidenced that his services were not employed in connection with the delay.

■■■ While we are cognizant that delay may compel a contractor to hire another draftsman or engineer· to work on a project, thereby causing an increase in his ratio of variable overhead expenses to direct cost outlays—a compensable item of delay damage, see Note, *Home Office Overhead as Damages for Construction Delays*, 17 Ga.L.Rev. 761, 786 (1983); *see generally, Manshul, supra,* we are not convinced that such is the case here. Plaintiff presented no proof that Fisher was hired as a result of defendant's delay. Indeed, the voluminous evidence concerning delay and acceleration which we have already, discussed at length has amply shown that modification and revision of existing pipe work continued beyond Fisher's termination in May, 1981 through at least August, 1981. We find that plaintiff has not met its burden of proving that the Fisher claim is an extra cost generated by and attributable to defendant's breach. Accordingly, we are compelled to deny an award of damages on this claim.

## D. *The Excess Supervision Claim*

The final element of damage sought by plaintiff is $174,225.98 for daytime (not overtime) wages paid by plaintiff to additional superintendents hired pursuant to union rule requirements during the acceleration period. Neither party disputes that pursuant to these union rules, Harmonay had to hire one foreman for every ten journeymen or mechanical workers (Exs. 86–86A), and that Binks paid for the overtime wages of these supervisors. (Tr. 558–60)

At trial, Klapp testified that Harmonay had planned a 26 person work crew for the Binks' project; an Elpo crew of ten workers, a Phosphate crew of ten workers, and a six person fabrication shop. (Tr. 571–72) Harmonay had anticipated supervision by three foremen and a project superintendent, Camardella. (Tr. 558–60; 571–72) Due to the delay and subsequent acceleration, it was necessary for plaintiff to hire larger crews with resultant excess and nonproductive supervision. Because these additional foremen performed no actual work on the job—being there only by virtue of union rules—plaintiff alleges that it incurred additional labor costs of $174,-225.98, the actual amount of non-overtime monies paid to the excess supervisors. (Tr. 558–60)

Binks first argues that plaintiff's failure to submit into evidence its bid documents to prove actual planned supervision precludes this claim. While we agree that the better part of wisdom dictated that these documents should have been introduced, we find credible the testimony by Klapp as to plaintiff's planned supervision, particularly in light of our independent review of Harmonay's daily labor and material vouchers from the early stages of acceleration, June 20–July 25, 1981 (Ex. 125), wherein the work crew figures range from 16 to 29 men.

■■■ Binks next argues that the excess supervision claims should not be calculated based on its actual costs. Instead, it suggests that the maximum claim for "excess" supervision be based on the 30 percent inefficiency factor. We find defendant's suggested percentage formula to be speculative at best; indeed, it is inapplicable. · Plaintiff has properly premised this delay

claim upon additional direct costs—"damages traceable to defendant's breach." *Quaker-Empire Construction Co. v. D.A. Collins Construction Co., Inc.,* 88 A.D.2d 1043, 452 N.Y.S.2d 692, 694 (3d Dept.1982); *see Shalman v. Board of Educ. of Cent. School Dist. No. 1,* 31 A.D.2d 338, 341, 297 N.Y.S.2d 1000, 1003 (3d Dept.1969).

Binks next urges, apparently in the alternative, for a reduction of these figures. It first asserts that Camardella, plaintiff's project superintendent, was improperly included as an excess supervisor in plaintiff's claim, and secondly that the 1:10 supervisor to worker ratio mandated by the union was exceeded by Harmonay in several instances, allegedly resulting in unwarranted and excessive excess supervision.

■ With respect to the former contention, we find credible Klapp's testimony that crew and supervision planned by Harmonay included a 26 worker crew with three foremen *and* Camardella as project superintendent (Tr. 572), as we have previously discussed. Our review of the proferred evidence regarding excess supervision further buttresses this conclusion.

■ Regarding Binks' second assertion, we note that exhibit 125, which includes the Daily Labor and Material Vouchers submitted to Binks for payment of overtime wages to Harmonay's work crews and supervisors, lists, *inter alia,* the names of each journeyman, each foreman, a general foreman, and the superintendent, Camardella, followed by the wage rates for each of these positions and calculations of the total labor costs for each worker. These vouchers are dated and signed in each instance by Russ Flood of Binks. It is apparent that the actual number of supervisors, upon which defendant has premised its claim of inflation, was in fact derived from these overtime vouchers submitted to and *signed* by Binks each day. Defendant has offered no evidence to explain its acquiescence in the number of supervisors employed by Harmonay by reason of its delay. Defendant's very limited proof of "unexplained instances" of excessive supervision, the unsupported bald assertions in its brief, the total absence of oral and written proof on this factual issue, is wholly unsatisfactory. Thus, we find that defendant has waived any objection to these figures as claimed on this item of damages. *See, e.g., Village of Endicott v. Parlor City Contracting Co., Inc.,* 51 A.D.2d 370, 381 N.Y.S.2d 548 (3d Dept.1976); *Peter A. Camilli & Sons, Inc. v. State,* 41 Misc.2d 218, 245 N.Y.S.2d 521 (Ct.Cl.1963).

Our review of the total proof adduced on this issue, including the impressive exhibits, leads us to conclude that excess supervisors were properly employed at a cost to Harmonay of $174,225.98. Accordingly, we grant plaintiff damages for excess supervision costs in that amount.

**E. Interest**

■ Finally, plaintiff seeks recovery of interest on the damages awarded. Pursuant to express provisions in New York law, interest "shall be recovered" on a sum awarded for breach of contract. N.Y. CPLR 5001(a). While such interest is normally computed from the date the damage or cause of action accrued, *see Greater New York Coal & Oil Corp. v. Philadelphia & Reading Coal & Iron Co.,* 278 N.Y. 270, 15 N.E.2d 801 (1938), where the exact date of accrual of damages resulting from breach of contract is not clear, interest on recovery is to be computed from the date of the commencement of the action. *See High Quality Homes, Inc. v. Palmer,* 283 A.D. 954, 130 N.Y.S.2d 360 (2d Dept.1954); *Leehoke Corp. v. Plastoid Corp.,* 193 Misc. 208, 83 N.Y.S.2d 672 (Sup.Ct.1948).

■ In the instant case, plaintiff asserts that interest is to be computed from the date of the project completion, *i.e.,* February 28, 1982. Whatever contentions may be advanced as to when its damages began to accrue, it is evident that by the date the project was completed all of the damages sustained had accrued. Therefore, we award interest costs to plaintiff computed from February 28, 1982.

*Conclusion*

Upon the total trial record adduced in this case and the law applicable thereto, we

are compelled to conclude that plaintiff has fully met the burden of proof to the degree the law makes imperative. Accordingly, we find defendant liable for breach of contract and award plaintiff damages in the amount of $275,923.04 for loss of efficiency; $46,754.10 for overhead and profit on overtime; $8,329.00 for materials price escalation; $8,481.01 for equipment delay; $174,225.98 for excess supervision costs—total damages $513,713.13. Interest is to be computed from February 28, 1982.

Let judgment for plaintiff be entered accordingly.

SO ORDERED.