760 F.Supp. 1004 (1991)
UNITED STATES of America for the Use and Benefit of FALCO CONSTRUCTION CORPORATION, Plaintiff,
v.
SUMMIT GENERAL CONTRACTING CORPORATION and The Fireman's Fund Insurance Company, Defendants.
No. 89-CV-2931.
United States District Court, E.D. New York.
March 21, 1991.
*1005 Birnbaum & Birnbaum, Mineola, N.Y. (Harris Birnbaum, of counsel), for plaintiff.
Thomas Welby, White Plains, N.Y., for defendant Summit General Contracting Corp.
Hart & Hume, New York City (Eugene F. Brady, of counsel), for defendant Fireman's Fund Ins. Co.

MEMORANDUM and ORDER
BARTELS, District Judge.

BACKGROUND
In this Miller Act[1] case Falco Construction Corporation ("Falco"), the use plaintiff and subcontractor, seeks to recover monetary damages from Summit General Contracting Corporation ("Summit"), the general contractor, and Fireman's Fund Insurance Company, Summit's surety on its payment bond (jointly, the "defendants"). Falco commenced this action after Summit failed to pay $97,515.00, monies Falco alleged it was owed for services Falco rendered Summit pursuant to a written proposal (the "proposal" or "sub-contract") to drive test and production piles for a Naval Telecommunications Center ("NTCC") on Staten Island that Summit was constructing for the Department of the Navy (the "Navy"). Falco's demand for $97,515.00 included a claim for (a) $83,845.00 for eighty-nine (89) piles driven from March 8, 1989 through May 19, 1989; (b) $3,240.00 for costs associated with eleven (11) obstructed or broken piles; (c) $1,170.00 for costs associated with spudding[2] thirty-nine (39) piles; and (d) $9,080.00[3] for costs associated *1006 with driving additional piles on July 13, 1989. The defendants counterclaimed alleging they suffered $14,000.00 in damages on account of Falco's negligent, improper and delayed performance.
In December 1989, after finding that there were triable issues of fact regarding Falco's claim for obstructed piles, spudding and additional work performed on July 13, 1989, and defendants' counterclaim, the Court awarded Falco partial summary judgment in the amount of $69,045.00 plus interest, leaving in dispute a total of $28,470.00. See Memorandum and Order of this Court dated December 6, 1989. Thereafter, the defendants moved pursuant to Fed.R.Civ.P. 15(a) to amend their counterclaim alleging that as a result of Falco's delayed and improper performance they actually suffered $229,590.00[4] in damages. The Court granted defendants' motion.
This action was bifurcated and tried without a jury over an eight day period.

CONTENTIONS OF THE PARTIES

A. Falco's Claim

Falco maintains that (1) it is entitled to be reimbursed for spudding, admittedly extra work done without written authorization, notwithstanding the fact that the subcontract contains a contrary provision; (2) under the terms of the sub-contract Summit is responsible for extra costs associated with obstructed piles; and (3) the work performed on July 13, 1989 was pursuant to a separate oral agreement associated with the project that the parties entered into in June 1989.

B. Defendants' Counterclaim

In their counterclaim the defendants contend that Falco (1) provided non-conforming materials; to wit: production piles less than sixty (60) feet long; and (2) did not substantially perform its obligations under the sub-contract by April 17, 1989, thereby breaching the terms of the sub-contract. In essence, the defendants argue that Falco's failure to drive production piles that were a minimum of sixty (60) feet long set off a chain reaction that ultimately delayed construction of the NTCC by fifteen (15) weeks, from April 17, 1989 to August 2, 1989. At the heart of the defendants' counterclaim is an allegation, which Falco denies, that the piles which Falco maintains broke during the course of driving were in fact not broken and were only belatedly denoted as such simply to obscure the fact that the pile driving inspector rejected those piles because they were too short to satisfy the Navy's pile driving criteria.
After due deliberation and full consideration of all of the pleadings, testimony and other evidence the Court makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

FINDINGS OF FACT
1. In September 1988, the Navy awarded Summit a contract to construct the NTCC (the "prime contract"). Falco was not a party to the prime contract and is not bound by its terms. Thereafter, Summit solicited Falco's bid to drive test and production piles for the NTCC and forwarded a copy of the specifications, the pile foundation plan and results of pertinent soil borings[5] to Falco.
2. The specifications, which, parenthetically, are extremely detailed, do not establish a specific length for production piles not does it indicate a time for performance. Pile length is mentioned in only two contexts: First, with respect to bidding on the project, the contractor is advised that the bid length is sixty (60) feet; and second, test pile length is set at sixty-five (65) feet.
3. According to the specifications, the length of production piles would be determined based upon pile driving criteria which the Navy would establish after the *1007 test piles had been driven and load tested.[6]
4. The specifications also provide (a) a mechanism for adjusting the price of the prime contract in the event that pile length differed from that specified as the basis for bidding; (b) that spudding, a common pile driving practice, was permitted provided the Navy's representative on the job site approved; (c) the Navy could waive the pile driving criteria under certain circumstances;[7] and (d) the costs associated with spudded and redriven piles (piles driven to replace piles that were damaged, mislocated or driven out of alignment) are to be borne by the Contractor, in this case Summit, not the Navy.
5. Based on the soil borings, the foundation plan and the specifications Falco's engineer K.K. Ramamurthy ("KK") drafted the proposal[8] which provided in pertinent part that: (a) Falco would "furnish and install 81 creososted [sic] wood piles driven to 30 ton design load in conformance with NYCB [New York City Building] code" ("NYCBC"); (b) Summit would pay Falco an additional sum if piles longer than sixty (60) feet were driven and Falco would credit Summit if piles shorter than sixty (60) feet were used; (c) "all costs due to redesign together with associated costs for remedial work on account of pile deviation, broken piles, etc." were excluded from the price; and (d) any alteration or deviation from the basic proposal which involved extra costs required a separate written agreement.
6. The sub-contract, which embodied all the terms of the parties' agreement, did not specify the time of performance, nor did it contain a damage penalty clause. Furthermore, the subcontract did not incorporate by reference the terms of the prime contract.[9]
7. On December 1, 1988, George Vrettos ("Vrettos"), Summit's project manager, orally accepted the proposal, provided that the price was reduced from $87,500 to $85,000. KK orally agreed to the modification, thereby amending the sub-contract.
8. Summit estimated that the pile driving phase of the operation, including test and production pile driving, should have taken a total of ten and one half weeks.
9. Falco could not begin driving test piles until March 8, 1989, when, relying on its analysis of the soil borings and its pile driving experience, both generally and in the area of the NTCC, it drove six test piles varying in length from fifty (50) to fifty-five (55) feet. (Although the specifications called for five (5) test piles six (6) were actually driven because the first test pile, number 7, had to be pulled and redriven in a new location after it broke at a depth of minus eight (8) feet.)
10. Despite the fact that the test piles were less than sixty-five (65) feet long, as called for in the specifications, the Navy selected two test piles for load testing.
11. Based on the load test data the Navy established the following pile driving criteria for production piles: (1) minimum tip elevation of minus thirty-five (35) feet, approximately forty-five (45) feet embedded length; and (2) driving resistance of at least thirty-five (35) blows per foot for the last foot of driving. The pile driving criteria were more severe than is customary in the industry, therefore, there was a greater likelihood that a pile might be overdriven and break.
12. Given the conflicting expert testimony regarding which layer of soil a pile would "fetch up" in (satisfy the pile driving *1008 criteria), it was reasonable to conclude that a pile would "fetch up" in either the medium dense or dense layer of soil which, according to the soil borings, was located at an elevation of minus thirty-five (35) feet and minus (45) feet, respectively. (Due to subsurface conditions, however, these elevations could vary approximately five (5) feet plus or minus. Therefore, the medium dense layer could begin at minus thirty (30) feet and the dense layer at minus forty (40) feet.)
13. Production pile driving began promptly on April 10, 1989 and continued on April 11, 14, 17 and May 19. During that time a total of nine (9) piles  numbers 11, 14, 14A, 12, 22, 46, 48, 53, and 81  broke, apparently after hitting a subsurface obstruction.[10] The evidence regarding pile numbers 40 and 71A, which Falco claims also broke, is inconclusive.[11]
14. Falco's pile driver exercised no discretion with respect to selecting the location for piles that were driven to replace broken piles.
15. According to the prime contract Navy architects and engineers have the exclusive authority to accept or reject piles. Accordingly, following this phase of production pile driving, Navy engineers reviewed the pile driving logs and the resurvey of "as driven" piles ("resurvey"). On May 12, 1989, following that review, the Navy advised Summit that: (a) thirty-five (35) production piles, varying in length from forty-five (45) to sixty (60) feet, satisfied both the pile driving criteria and deviation limits[12]; (b) thirty-seven (37) piles met the pile driving criteria but exceeded the driving tolerance established by the Navy and required pile cap redesign;[13] and (c) nine (9) piles  numbers 7A, 57, 58, 70, 71, 74, 76, 78 and 79  were rejected. Representatives from Falco, Summit and the Navy met on May 18, 1989 to discuss the rejected piles and the Navy ultimately rejected only three (3) piles  numbers 57, 58, and 71A. Falco agreed to redrive those piles, at no charge to Summit, and did so on May 19, 1989. On or about May 19, 1989 Vrettos told KK to dismantle and remove the pile driving rig because the job was finished.
16. As of May 19, 1989 Falco had driven a total of eighty (80) piles that satisfied the Navy's pile driving criteria and could sustain a thirty (30) ton design load.
17. The pile deviation and subsequent pile cap redesign resulted from factors beyond Falco's control, such as subsurface obstructions which caused a pile to break and have to be redriven in a new location, or the configuration of the pile itself. It was not due to the pile driver's negligence or the fact that Falco drove piles less than sixty (60) feet in length.
18. Pile deviation, which is not a function of pile length, and pile cap redesign are common occurrences in all pile driving operations. Therefore, even if no replacement piles had been driven pile cap redesign was virtually inevitable.
19. Between May 19, 1989 and approximately June 25, 1989 the Navy's engineers and architects reviewed various documents including the pile driving logs of those piles driven on May 19, 1989 and a resurvey of the piles as driven after May 19, 1989.
20. On or about June 25, 1989 the Navy advised Summit that based on the information it had just reviewed it had to modify the pile foundation. The new Navy requirements could have been satisfied in various ways, however, Summit opted to meet the Navy's demands by driving three additional piles  17B, 33B, and 58C. According to an assistant resident Navy engineer it was not necessary to drive the *1009 eighty-first pile, number 58C,[14] in order to complete construction of the NTCC. Piles 17B and 33B, balancing piles, added to the foundation to correct eccentricity were not essential in that the eccentricity could have been remedied by means other than driving additional piles. Vrettos then contacted KK to arrange for Falco to return to the NTCC.
21. As of May 19, 1989 Falco had, within a reasonable period of time, completely performed its obligations under the subcontract.19. Pursuant to Vrettos's oral arrangement with KK, Falco remobilized its equipment and crew and returned to the NTCC job site on July 13, 1989 to drive three new piles. This additional work, which Summit requested, was beyond the scope of the subcontract since these piles were added either as a remedial measure on account of pile deviation and pile cap redesign. The parties, however, did not agree on a price for this additional work.[15]
22. Falco's personnel had no authority to order spudding. The Navy authorized the spudding and either Summit or Navy personnel orally ordered Falco to spud a total of thirty-nine (39) piles, including five test piles.
23. Falco's charge for spudding, obstructed piles, and remobilization of the crew and equipment was, according to the evidence, fair and reasonable based on the custom in the industry.

CONCLUSIONS OF LAW

A. Falco's Claim

1. Broken Piles

It is a fundamental principle of contractual construction that when the terms of a written contract are clear and unambiguous, the intent of the parties must be found therein. Slatt v. Slatt, 64 N.Y.2d 966, 488 N.Y.S.2d 645, 646, 477 N.E.2d 1099, 1100 (1985); Chun Hye Kang-Kim v. Feldman, 121 A.D.2d 590, 503 N.Y.S.2d 855, 856 (1986); 4 S. Williston, Williston on Contracts § 600, at 280 (3d ed.1961). Moreover, "contractual ambiguity is not established, simply because the parties disagree as to the meaning of a particular provision, and where there is no inherent ambiguity, courts should not, under the guise of judicial construction, reach an artificial interpretation...." Libra Bank Ltd. v. Banco Nacional De Costa Rica, S.A., 570 F.Supp. 870, 893 (S.D.N.Y.1983) (citations omitted).
The sub-contract expressly provides that the basic price of $85,000 "exclude[s] all costs due to redesign together with associated costs for remedial work on account of pile deviation, broken piles, etc." Notwithstanding defendants' arguments to the contrary, it is clear from this unambiguous language that the parties intended that Falco would be reimbursed additional sums for costs it incurred as a result of pile breakage, regardless of whether those piles were denoted as obstructed or broken on the pile driving logs. Moreover, it is beyond peradventure that costs associated with "remedial work on account of broken piles" includes the cost of the pile that is broken  calculated in dollars per foot  as well as other costs attendant to driving the pile, i.e., pile driver's salary and overhead. Therefore, since the Court has found that a total of ten piles  one (1) test pile and nine (9) production piles  representing a total of 510 feet[16], broke during the pile driving phase of the operation, and that Falco's *1010 charge of $6.00 per foot to replace an obstructed/broken pile is a reasonable charge, Falco is entitled to recover a total of $3,060.

2. Spudding

Extra work generally refers to work required because of unanticipated conditions. Seebold v. Halmar Constr. Corp., 146 A.D.2d 886, 536 N.Y.S.2d 871, 873 (1989), citing Savin Bros. v. State of New York, 62 A.D.2d 511, 516, 405 N.Y. S.2d 516, (1978) aff'd. 47 N.Y.2d 934, 419 N.Y.S.2d 969, 393 N.E.2d 1041. (1979). The defendants do not allege that the spudding was not extra work nor, do they dispute that fact that Falco spud a total of thirty-nine (39) piles. Rather, the defendants contend that Falco spud the piles without any authorization, written or verbal.
Notwithstanding a provision in the agreement to the contrary, under New York law "when a party knowingly receives and accepts the benefits of extra work outside the scope of a construction contract orally directed by himself and his agents, such conduct constitutes a waiver of the requirement [that the extra work be performed pursuant to a written request]." S. Leo Harmonay, Inc. v. Binks Mfg. Co., 597 F.Supp. 1014, 1032 (S.D.N.Y.1984), aff'd, 762 F.2d 990 (2d Cir.1985); Davis Accoustical Corp. v. Nat'l Sur. Corp., 27 A.D.2d 624, 275 N.Y.S.2d 925, 927 (1966); accord Howdy Jones Constr. Co. v. Parklaw Realty, Inc., 76 A.D.2d 1018, 429 N.Y. S.2d 768, 770 (1980), aff'd, 53 N.Y.2d 718, 439 N.Y.S.2d 354, 421 N.E.2d 846 (1981). Moreover, having accepted the benefits, the contractor is equitably bound to pay the reasonable value thereof. Care Systems, Inc. v. Laramee, 155 A.D.2d 770, 547 N.Y. S.2d 471, 472 (1989).
It is clear that Summit's conduct constituted a waiver of the provision which required Falco to obtain, for its own protection, a written authorization for extra work. The Court found that Falco did not act unilaterally when it spud the piles. Falco undertook this extra work only when it was orally ordered to do so either by Summit or Navy personnel. Even if the actual verbal order came from Navy personnel there is no doubt that Summit was aware of and at least passively, if not actively, acquiesced in that order. Summit clearly benefitted from the spudding in that spudding reduced the likelihood that a pile would be damaged or destroyed while it was being driven. Accordingly, having found that the charge for spudding is fair and reasonable Falco is entitled to recover the amount claimed  $1,170.

3. Charges for July 13, 1989

The defendants' claim that there was no separate oral arrangement between Summit and Falco for Falco to return to drive additional piles on July 13, 1989 is belied by the evidence, and the Court has so found. The uncontroverted evidence adduced at trial was that Falco was advised by Summit, on or about May 19, 1989 to dismantle and remove its rig from the construction site because the pile driving phase of the project was complete and the piles were acceptable. Approximately five weeks later, Vrettos, Summit's project manager, contacted KK, Falco's engineer, and advised him that due to pile cap redesign additional piles had to be driven. Inasmuch as the sub-contract specifically excluded any additional work due to redesign of this nature it is obvious that Falco remobilized its crew and equipment and returned to the NTCC because of a separate and distinct arrangement between itself and Summit to enable Summit to comply with the Navy's directive, and not because of any duty Falco owed Summit under the sub-contract.
Under New York law no contract can be formed where the parties have not agreed on an essential term, V'Soske v. Barwick, 404 F.2d 495, 500 (2d Cir.1968) (citations omitted), cert. denied, 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969), such as price. Tradeways Inc. v. Chrysler Corp., 342 F.2d 350, 353 (2d Cir.), cert. denied, *1011 382 U.S. 832, 86 S.Ct. 71, 15 L.Ed.2d 75 (1965). The undisputed evidence was that the parties had not agreed on the price Summit would pay Falco to return to the NTCC. Therefore, the oral arrangement is unenforceable and fails to supply the basis for Falco's claim to costs associated with the work it performed on July 13, 1989.
This, however, does not end the Court's inquiry. Since the Court is guided by equitable as well as legal principles Falco may recover for the additional work it performed in July under the theory of quasi contract. "A `quasi contract' only applies in the absence of an express agreement, and it is not really a contract at all, but rather a legal obligation imposed in order to prevent a party's unjust enrichment." Clark-Fitzpatrick v. Long Island R.R. Co., 70 N.Y.2d 382, 521 N.Y.S.2d 653, 656, 516 N.E.2d 190, 193 (1987) (citations omitted). The sub-contract did not encompass the relationship between the parties with respect to the work performed on July 13, 1989 and there is no other enforceable agreement between the parties for that work. Moreover, it is obvious that Summit derived a substantial benefit from the work Falco performed on July 13, 1989. Therefore, since Summit requested that Falco return to the NTCC to do additional work for which Falco would receive additional monies, and Falco in fact rendered services in accordance with that request, Falco should recover the reasonable costs associated with the work it performed on July 13, 1989, a total of $9,080.

B. Defendants' Counterclaim

1. Non-conforming Materials

The essence of defendants' counterclaim that Falco breached the terms of the sub-contract because it failed to furnish and install production piles that were a minimum of sixty (60) feet long is patently repudiated by the evidence. In adjudicating the rights of parties a basic tenet of contractual construction requires that a court "not fashion a new contract ...; rather, [it is] required to discern the intent of the parties, `to the extent that the parties evidenced what they intended by what they wrote.'" Slatt, 488 N.Y.S.2d at 646, 477 N.E.2d at 1100 (citations omitted). The sub-contract and the specifications both address the question of pile length and neither document either explicitly or implicitly obligated Falco to furnish production piles exclusively sixty (60) feet or longer. On the contrary, both the specifications and the sub-contract contemplated and provided for the possibility that shorter production piles might be used. Moreover, Summit intended by its assent to the terms of the sub-contract to take advantage of a rebate provision in the sub-contract whereby Falco would credit Summit $5.00 per lineal foot for piles less than sixty (60) feet long. This undisputed evidence clearly belies the defendants' argument that Summit and the Navy intended that Falco furnish and install sixty (60) foot long piles.
The defendants' claim that Falco furnished non-conforming materials is also repudiated by the fact that the Navy ultimately accepted and incorporated into the pile foundation a significant number of piles that were less than sixty (60) feet long. Finally, although a number of pile caps were redesigned because of pile deviation (which was only partially due to piles being redriven to replace broken piles) there is no evidence to support the defendants' claim that if Falco had used longer piles in the first instance there would have been no need to redesign pile caps because sixty (60) foot piles would not have broken and would have all "fetched up" without exceeding the driving tolerances. There is no basis to conclude that the use of piles less than sixty (60) feet long was the proximate cause of the pile cap redesign.

2. Timely Performance

The defendants' allegation that Falco failed to perform its duties under the sub-contract within a reasonable period of time is also unfounded. Before determining whether Falco's performance was timely the Court, relying on the language of the *1012 agreement, must determine what the parties intended by making the sub-contract. Pantone, Inc. v. Esselte Letraset Ltd., 691 F.Supp. 768, 771 (S.D.N.Y.) (citations omitted), aff'd, 878 F.2d 601 (2d Cir.1988). Furthermore, the words of the sub-contract are to be given their plain meaning, Carpenter v. Machold, 86 A.D.2d 727, 447 N.Y.S.2d 46 (1982), and the Court may not under the guise of contractual construction rewrite the sub-contract. Tantleff v. Truscelli, 110 A.D.2d 240, 493 N.Y.S.2d 979, 982-983 (1985), aff'd, 69 N.Y.2d 769, 513 N.Y.S.2d 113, 505 N.E.2d 623 (1987).
Under the terms of the sub-contract Falco was obligated to furnish and install eighty-one (81) creosote wood piles driven to a thirty (30) ton design load and, according to the specifications, the piles were to meet pile driving criteria established by the Navy. It is apparent that the parties did not intend that Falco drive the piles in a vacuum, rather they intended that Falco drive the piles in such a fashion that a foundation could be poured upon which the NTCC could be built. As of May 19, 1989 Falco had done precisely that.
The undisputed evidence in this case is that as of May 19, 1989 Falco had driven a total of eighty (80) piles that satisfied the Navy's pile driving criteria and could also sustain a thirty (30) ton design load according to the NYCBC. Furthermore, the evidence revealed that in order to create a foundation upon which the NTCC could be built, it was not necessary to drive the additional piles Falco drove on July 13, 1989  17B, 33B and 58C. Piles 17B and 33B, balancing piles, were added to the foundation plan to correct for eccentricity which resulted from pile deviation. However, the Navy's engineers stated that the eccentricity could be corrected by means other than driving additional piles. In addition, an assistant Navy engineer testified that the NTCC could have been built even if pile 58C had never been driven.
There is also irrefutable evidence that on May 19, 1989, after Falco drove three piles to replace those rejected by the Navy, Summit's quality control officer, David Migdal, made the following comment in his report to the Navy: "Pile driver on job since 3/10/89. Job completed and rig broken down for removal."[17]
In addition, given the fact that pile driving is not an exact science and that pile breakage, pile deviation and pile cap redesign are common occurrences on all pile driving jobs, there is no doubt that the parties anticipated that all of the foregoing phenomenon might occur and that more than eighty-one (81) piles would be driven. Notwithstanding the defendants' claim to the contrary, the fact that there was pile breakage, pile deviation and pile cap redesign on this project does not support the defendants' claim that this constitutes a material breach of the sub-contract.
For the foregoing reasons the Court concludes that as of May 19, 1989 Falco had fully performed its obligation under the terms of the sub-contract.
With respect to the timeliness of that performance, it is a matter of hornbook law that where a contract lacks an express provision regarding the time of performance a reasonable time is implied. Young v. Whitney, 111 A.D.2d 1013, 490 N.Y.S.2d 330, 331 (1985) (citations omitted); Webster's Red Seal Publications, Inc. v. Gilberton World-Wide Publications, Inc., 67 A.D.2d 339, 415 N.Y.S.2d 229, 231 (1979), aff'd, 53 N.Y.2d 643, 438 N.Y.S.2d 998, 421 N.E.2d 118 (1981). In determining what is a reasonable time the fact finder should consider the facts and circumstances of the particular case, including the subject matter of the contract, what the parties contemplated at the time of contract, and the circumstances surrounding performance. Zev v. Merman, 73 N.Y.2d 781, 536 N.Y.S.2d 739, 533 N.E.2d 669 (1988); Young, 490 N.Y.S.2d at 331-332.
In this instance the sub-contract failed to state a time of performance. However, relying on the guideposts set forth in Zev, the Court, as fact finder, determined that *1013 May 19, 1989, and not April 17, 1989, as the defendants' suggest in their counterclaim, was a reasonable time for Falco to complete its performance under the terms of the sub-contract. The Court predicated this conclusion on the following factors: First, and foremost, according to Summit's estimate the pile driving phase of the operation would take approximately ten and one half weeks.[18] That is precisely the amount of time that elapsed between March 8, 1989, the first day of test pile driving, and May 19, 1989, the date Falco completed its performance under the terms of the sub-contract.
Second, implicit in the defendants' counterclaim is the assumption that the next phase of construction, pouring the pile caps, could have begun immediately after the pile driving hammer struck its final blow on April 17. That assumption is without merit. Summit is aware that according to the terms of the prime contract, the Navy's engineers had the ultimate authority to accept or reject piles, and that the pile caps could not be poured until the Navy engineers had reviewed the pile driving logs and the resurvey. Clearly, therefore, even if each pile had been driven to perfection, and there would have been no need to redesign any pile caps or redrive any piles the next phase of construction could not have begun on April 17. In all events it actually took Falco only five (5) days to drive the production piles (April 10, 11, 14, 17 and May 19); it took the Navy's engineers approximately four and one half weeks  from April 17, 1989 to May 16, 1989  to review the pile driving logs and the resurvey, and advise Summit that three (3) piles had to be redriven. A task, which, according to expert testimony, should have taken approximately one week. It was the Navy's unexplained delay in reviewing the documents that caused the production pile driving phase of the operation to extend from April 17 to May 19. It is unreasonable to charge Falco with delay during this period.
In order to prevail on their counterclaim that plaintiff breached the terms of the sub-contract by reason of delay the defendants must establish that Falco caused a substantial delay in performance, that the contract terms forbade such a delay, and that they were injured as a result. S. Leo Harmonay, 597 F.Supp. at 1026. The defendants have failed to satisfy the very first test, that of substantial delay in performance. The Court, as fact finder, determined that as of May 19, 1989 Falco completely performed under the terms of the sub-contract and, moreover, its performance was timely. Accordingly, the defendants have failed to prove their claim that Falco breached the terms of the sub-contract by failing to perform within a reasonable time.
Finally, the Court notes that "it is elemental contract law that when a court attempts to construe the meaning of a written agreement, the intention of the contracting parties must be given effect. And it is their intention as it existed at the time the contract was executed which must control rather than any subsequent intention tailored to complement an individual's posture once an agreement has gone sour." New England Merchants National Bank v. Iran Power, 502 F.Supp. 120, 127 (S.D. N.Y.1980). It is apparent to this Court that the construction of the NTCC did not proceed as Summit originally anticipated. It is equally apparent, based on the foregoing analysis, that Falco is not responsible or liable for the delay. Therefore, the defendants' attempt to rewrite the sub-contract with the benefit of hindsight is rebuffed.

CONCLUSION
For the foregoing reasons the Court awards plaintiff judgment in the amount of $28,110.00[19] plus interest at the legal rate *1014 from July 24, 1989, the date of its original Invoice to Summit, together with costs and disbursements. Defendants' claim for delay damages, as itemized in Attachment A to defendants' amended answer and counterclaim, is hereby denied in its entirety.
SO ORDERED.

NOTES
[1] 40 U.S.C. § 270a et seq.
[2] Spudding or pre-auguring is a process whereby a drill is used to create a hole in the ground into which the tip of a pile is set. This practice is commonly used when the pile driver is likely to encounter resistance due to subsurface soil conditions. The purpose of spudding is to reduce the likelihood of damaging or breaking a pile as it is being driven.
[3] This figure represents the combined charges for mobilization of equipment ($3,000.00), furnishing a pile crew to drive the additional piles ($5,000.00) and the cost of materials; to wit, 180 linear feet of creosote wood pile at $6.00 per linear foot ($1,080.00).
[4] This figure includes costs for salaries and salary benefits, site overhead, office overhead, miscellaneous extra costs for testing, redesign, rebars, labor and concrete, and the amount of liquidated damages assessed by the Navy against Summit.
[5] Soil borings is the process by which soil is removed and then analyzed to determine the nature of the subsurface soil. The results, which also include the elevation at which various types of soil are found, are then used as an aid in determining the length of pile needed for a particular job.
[6] Load testing is a procedure whereby a weight equalling twice the design load is placed on the pile for forty-eight (48) hours. The purpose of the test is to determine the capability of a pile to sustain the design capacity.
[7] For example, Navy engineer's could approve a pile that satisfied the minimum blow count (thirty-five (35) blows per foot for last foot of driving) but did not satisfy the minimum tip elevation (minus thirty-five (35) feet). Therefore, it is entirely possible that piles even less than forty-five (45) feet in length could be accepted by the Navy's engineers and incorporated into the pile foundation.
[8] The full text of the Proposal is set forth in the Supplemental Index to this Memorandum.
[9] The notation in the upper right hand corner of the sub-contract to the number of the prime contract was most probably made for billing and correspondence purposes.
[10] The Court credits the testimony of Stanley Merjan and William Loftus, licensed professional engineers with many years of pile driving experience, who concluded, based on the erratic blow counts recorded by the field inspector, that these piles were broken. Furthermore, Summit's allegations that someone tampered with the pile driving logs or engaged in any other form of skullduggery is unfounded.
[11] Mr. Merjan's testimony with respect to these piles was equivocal.
[12] Pile deviation occurs when a pile exceeds the specified driving tolerances.
[13] Twenty-eight (28) of the thirty-seven (37) piles were original as opposed to replacement piles.
[14] The history of pile 58 is noteworthy. Pile 58, a 60 foot pile, failed to meet the criteria and was retapped pursuant to the Navy's authorization. Subsequently, the Navy rejected the pile and ordered it redriven and Falco drove piles 58A and 58B on May 19, 1989. The Navy rejected these piles as well and requested that pile 58C be driven.
[15] KK testified that Vrettos agreed to pay Falco an additional sum of money to return to the NTCC to drive the additional piles but no amount was ever discussed.
[16] Pile Number Pile Length
 7 55 feet
 11 50 feet
 14 50 feet
 14A 50 feet
 12 50 feet
 46 45 feet
 48 50 feet
 22 45 feet
 53 60 feet
 81 55 feet

[17] See Plaintiff's Exhibit 14.
[18] See Exhibit G of defendants' Notice of Motion dated February 27, 1990.
[19] This figure represents the aggregate of the amounts due Falco for the broken piles, the spudding, and the work performed on July 13, 1989, a total of $13,310.00, plus $14,800.00, the amount of defendants' original counterclaim, which amount the Court deducted when it awarded Falco partial summary judgment.